**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **GEORGE H. RYAN, SR.** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | No. 10 C 5512 |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | Judge Rebecca R. Pallmeyer |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

In April 2006, George H. Ryan, Sr., once Governor of Illinois, was convicted of racketeering, mail fraud, making false statements to the FBI, and tax violations. This court sentenced him to a prison term of 78 months, a sentence he is now serving. Ryan's conviction was affirmed by a divided Seventh Circuit and, after that court denied rehearing *en banc*, the Supreme Court denied *certiorari*. Earlier this year, however, the Supreme Court decided *Skilling v. United States*, 130 S. Ct. 2896 (2010), which imposed limits on the scope of the "honest services" mail fraud theory under which Ryan was convicted. In the wake of *Skilling*, Mr. Ryan has filed a petition pursuant to 28 U.S.C. § 2255. He urges that his mail fraud and RICO convictions must be overturned, and has asked the court to vacate, set aside, or correct his sentence to reflect the interpretation of the mail fraud statute articulated in *Skilling*. Ryan also asks the court to release him on bail pending the ultimate resolution of this motion. For the reasons described herein, the court denies Ryan's motion to vacate, set aside, or correct his sentence, and denies Ryan's motion to set bail.

## BACKGROUND

On April 17, 2006, following a six-month trial, a jury convicted George Ryan of conspiring to use the resources of the State of Illinois for his personal and financial benefit in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(d); devising a scheme to defraud the people of the State of Illinois and the State of Illinois of money, property, and the right to his honest services, in violation of the federal mail fraud statute, 18 U.S.C. §§ 1341,

1346; making false statements to the FBI, 18 U.S.C. § 1001(a)(2); obstructing the Internal Revenue Service, 26 U.S.C. § 7212(a); and filing materially false tax returns, 26 U.S.C. § 7206(1). *See United States v. Warner*, No. 02-cr-506, 2006 WL 2583722, at *1 (N.D. Ill. Sept. 7, 2006). The court set aside that verdict with respect to two mail fraud counts, *id.* at *12, but otherwise upheld the jury's determinations. Ryan's co-Defendant, Lawrence Warner, was convicted on related counts. On September 11, 2006, the court sentenced Ryan to 78 months on the racketeering count, 60 months on the mail fraud and false statement counts, and 36 months on the tax fraud counts, all to run concurrently. (Order [888] at 2.)[1] The court also sentenced Ryan to one year of supervised release. (*Id.*) The Seventh Circuit upheld Ryan's conviction on appeal. *United States v. Warner*, 507 F.3d 508 (7th Cir. 2007), *cert. denied*, 553 U.S. 1064 (2008). Ryan began serving his sentence in November 2007, and has served approximately 36 months. (Order [984].) Because the facts of this case have been discussed at length in the court's previous opinions and in the Seventh Circuit,[2] the court will not repeat them here.

In June 2010, the Supreme Court decided *Skilling v. United States*, 130 S. Ct. 2896 (2010). Vacating the conviction of Jeffrey Skilling on charges that grew out of the Enron collapse, the Supreme Court held there that "honest services" mail fraud encompasses only "paradigmatic cases of bribes and kickbacks." 130 S. Ct. at 2933. Ryan brought this petition on August 31, 2010, pursuant to 28 U.S.C. § 2255, which allows a federal prisoner to "move the court which imposed

---

[1]     All docket entries and trial references with the exception of the transcript of the oral argument on this motion and the docket entries on the instant motions refer to Ryan's original case, No. 02-cr-506.

[2]     This case has generated numerous written opinions. *See United States v. Warner*, 292 F. Supp. 2d 1051 (N.D. Ill. 2003); *United States v. Warner*, No. 02-cr-506, 2004 WL 144125 (N.D. Ill. Jan. 16, 2004); *United States v. Warner*, No. 02-cr-506, 2004 WL 1794476 (N.D. Ill. Aug. 11, 2004); *United States v. Warner*, 396 F. Supp. 2d 924 (N.D. Ill. 2005); *United States v. Warner*, No. 02-cr-506, 2005 WL 2367769 (N.D. Ill. Sept. 23, 2005); *United States v. Warner*, No. 02-cr-506, 2005 WL 2756222 (N.D. Ill. Oct. 21, 2005); *United States v. Warner*, No. 02-cr-506, 2006 WL 2583722 (N.D. Ill. Sept. 7, 2006), *aff'd*, 498 F.3d 666 (7th Cir. 2007), *reh'g en banc denied*, 506 F.3d 517 (7th Cir. 2007), *motion to stay denied*, 507 F.3d 508 (7th Cir. 2007), *cert. denied*, 553 U.S. 1064 (2008); *United States v. Warner*, No. 02-cr-506, 2006 WL 2931903 (N.D. Ill. Oct. 13, 2006).

the sentence to vacate, set aside or correct the sentence" if his sentence "was imposed in violation of the Constitution or laws of the United States." 28 U.S.C. § 2255(a). A § 2255 petition must be filed within one year of "the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized and made retroactively applicable to cases on collateral review." 28 U.S.C. § 2255(f)(3). The Government agrees that the decision in *Skilling* re-sets the clock for filing of Ryan's post-conviction petition "because it 'narrow[s] the scope of a criminal statute by interpreting its terms,' and therefore announces a new substantive rule of criminal law." (Response Br. at 11 n.5, quoting *Schriro v. Summerlin*, 542 U.S. 348, 351-52 (2004)).

## DISCUSSION

Ryan advances two grounds in support for his motion to vacate or set aside his mail fraud and RICO convictions. First, he urges that *Skilling* undermines the jury instructions: "Because the court's jury instructions were erroneous under *Skilling* and the error was not harmless, Ryan's conviction and Sentence are unlawful." (Mot. to Vacate ¶ 14.) Second, Ryan urges that under the standard established in *Skilling*, the evidence is "insufficient to support Ryan's mail fraud and RICO convictions . . . ." (*Id.*) Because his conviction should be vacated, Ryan urges, he should be released immediately and admitted to bail. (Mot. to Set Bail ¶ 2.)

*Skilling* is unquestionably relevant here and warrants examination of Ryan's conviction. That said, it is important to note that Skilling's appeal to the Supreme Court presented substantially different circumstances from those in Ryan's case. Skilling had been charged with "conspiring to defraud Enron's shareholders by misrepresenting the company's fiscal health, thereby artificially inflating its stock price." *Skilling*, 130 S. Ct. at 2934. Skilling was prosecuted for these acts, characterized as depriving his private employer and its shareholders of the intangible right to his honest services, and the Supreme Court "acknowledge[d] that Skilling's vagueness challenge has force." *Id.* at 2929. George Ryan, on the other hand, held statewide elected office, and as more fully described below, the conduct for which he was convicted—steering contracts, leases, and

other governmental benefits in exchange for private gain—was well-recognized before his conviction as conduct that falls into the "solid core" of honest services fraud. Such conduct was identified by the Court in *Skilling* as the proper target of § 1346. *Id.* at 2930-31.

In response to Skilling's argument that the statute is void for vagueness, the Supreme Court acknowledged that due process requires any "'penal statute [to] define the criminal offense [1] with sufficient definiteness that ordinary people can understand what conduct is prohibited and [2] in a manner that does not encourage arbitrary and discriminatory enforcement.'" *Id.* at 2927-28 (quoting *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)). Ryan's current challenge does not rest on vagueness grounds, and the court believes that, in the language of *Skilling*, Ryan clearly understood "what conduct was prohibited" and could not have been surprised that he was subject to prosecution. Ryan's efforts to conceal his conduct from public scrutiny themselves demonstrate he knew it was improper. Indeed, long before George Ryan and his associates wrote this chapter in Illinois's distressing history of public corruption, one of Ryan's predecessors as Governor, Otto Kerner, was prosecuted under this same theory by an earlier United States Attorney.[3] On direct appeal in this case, the Seventh Circuit acknowledged that the statute could be challenged if Defendants Ryan and Warner "could not have known that the conduct underlying their convictions could be considered 'depriv[ing] another of the intangible right of honest services.'" *United States v. Warner*, 498 F.3d 666, 697 (7th Cir. 2007) (quoting 18 U.S.C. § 1346). As applied in this case, the Court of Appeals concluded, the statute is not unconstitutionally vague—a conclusion that drew no comment from the dissenting judge.

Four years ago, in writing about Ryan's prosecution, Professor Alschuler (who was not then one of Ryan's lawyers) asserted that "the mail fraud and RICO statutes unfairly stack the deck" in large part because the Government was allowed to present "every allegation of criminal and

---

[3]     Professor Alschuler, now one of Ryan's attorneys, characterized the prosecution of Otto Kerner in 1973 as one of the trailblazing honest services prosecutions. Albert W. Alschuler, *The Mail Fraud & RICO Racket: Thoughts on the Trial of George Ryan*, 9 GREEN BAG 2D 113, 114 (2006).

non-criminal misconduct by Ryan and Warner that prosecutors have collected," and if "some of the dirt they have thrown at the wall has stuck, [the jury] is likely to find the defendants guilty of the principal charges against them." 9 GREEN BAG 2D at 113. At oral argument on the motions before this court, Alschuler argued again that "[a]ll of this evidence went into one churning cauldron." (Oral Arg. at 5.) *Skilling*, however, did not invalidate the honest services mail fraud statute, nor did it invalidate RICO. *Skilling* limited prosecutions under these statutes to bribery and kickback schemes—the very theory of prosecution under which Ryan was convicted. *Skilling* emphasized that when Congress reinstated the honest services mail fraud statute after it was invalidated by *McNally v. United States*, 483 U.S. 350 (1987), the focus was on "core" or "paradigmatic" cases involving kickback or bribery schemes. The *Skilling* Court made several references to *Shushan v. United States*, 117 F.2d 110 (5th Cir. 1941), as an example of the paradigmatic case that would survive its ruling. *Skilling*, 130 S. Ct. at 2926, 2931. Notably, our own Court of Appeals[4] relied on *Shushan* when it upheld Otto Kerner's conviction, quoting this language:

> No trustee has more sacred duties than a public official and any scheme to obtain an advantage by corrupting such an one must in the federal law be considered a scheme to defraud. . . . A scheme to get a public contract on more favorable terms than would likely be got otherwise by bribing a public official would not only be a plan to commit the crime of bribery, but would also be a scheme to defraud the public.

*United States v. Isaacs*, 493 F.2d 1124, 1150 (7th Cir. 1974) (quoting *Shushan v. United States*, 117 F.2d 115 (5th Cir. 1941)). The Seventh Circuit then observed that "this is precisely what occurred here. The citizens of Illinois were defrauded of Kerner's honest and faithful services as governor." 493 F.2d at 1151. Ryan's prosecution, like Kerner's before it, targeted conduct that remains at the core of honest services fraud.

While *Skilling* did not comment directly on Ryan's case, it came close. In a particularly relevant section, the Court noted that "the honest-services doctrine had its genesis in prosecutions

---

[4] While the case was decided by a Seventh Circuit panel, all of the judges were sitting by designation from other circuits because Kerner served on the Seventh Circuit after leaving the Governor's office.

involving bribery allegations." 130 S. Ct. at 2931 (citations omitted). That section cites *United States v. Sorich*, 523 F.3d 702, 707 (7th Cir. 2008), for its language that these prosecutions constitute "most [of the] honest services cases. . . ." *Sorich* itself, in the section cited in *Skilling* states:

> Broadly speaking, honest services fraud cases come in two types. In the first, an employer is defrauded of its employee's honest services by the employee or another. . . . In the second and more common type of case, the citizenry is defrauded of its right to the honest services of a public servant, again, by that servant or by someone else. For instance, in *United States v. Warner,* 498 F.3d 666 (7th Cir. 2007), the Illinois Secretary of State [Ryan] channeled state contracts and leases to a friend in return for paid vacations. In both examples above, and in most honest services cases, the defendant violates a fiduciary duty in return for cash-kickbacks, bribes, or other payments.

523 F.3d at 707. The Seventh Circuit and the Supreme Court have, thus, acknowledged that this case presents the paradigmatic type of case undisturbed by *Skilling*. This does not end our inquiry, of course, because neither court grappled with the details presented here. It does, however, suggest that in many cases,[5] and in Ryan's case, *Skilling* was not the sea change that Ryan urges.

Ryan's case warrants more examination because, rather than relying solely on a bribery theory, the Government chose also to present Ryan's mail fraud and RICO charges under a conflict-of-interest theory—the very same theory invalidated in *Skilling*. The result of this course of action is addressed below; for now, what matters is whether, in returning its verdict, the jury must have found those elements that would support a conviction under the still-valid honest services bribery theory. Further, the court must determine whether the instructions it gave the jury on the conflict-of-interest and related theories could have violated Ryan's substantial rights. As Ryan's attorneys argued repeatedly at trial, the conduct for which he and Warner were convicted does not

---

[5] The Seventh Circuit has already upheld two convictions challenged based on *Skilling* with little discussion. *See United States v. Cantrell*, 617 F.3d 919, 921 (7th Cir. 2010) ("This was clearly a kickback scheme, so § 1346–even as pared down by *Skilling*–applies to Cantrell."); *United States v. Lupton*, 620 F.3d 790, 803 n.3 (7th Cir. 2010) ("Lupton's scheme constitutes not a mere failure to disclose a conflict of interest . . . but rather the 'paradigmatic kickback fact pattern' . . . that remains within the ambit of § 1346.") (citation and quotation omitted); *id.* at 805 ("Lupton's conduct . . . placed him squarely within even the recently narrowed parameters of § 1346.").

fall into a plain-vanilla bribery fact pattern in which a suitcase of cash is exchanged for an official action. But *Skilling* does not say that it must. The method by which Ryan's co-schemers compensated him for official action requires a searching examination after *Skilling*, but as explained here, the conclusion that his conduct violates the law survives *Skilling*.

This court's analysis begins by considering the jury instructions to determine whether they are incorrect, based on the holding in *Skilling*. If so, the court next examines whether the error was nevertheless harmless. The court proceeds to address the Government's contention that, even if the honest services charge in this case exceeds what is permissible after *Skilling*, the jury would nevertheless necessarily have convicted Ryan of pecuniary fraud. The court briefly examines Ryan's challenge to the sufficiency of the evidence; an in-depth examination is unnecessary because the harmless error standard requires more than the sufficiency-of-the-evidence test. Finally, the court determines whether evidence introduced at trial would be barred in a post-*Skilling* honest services prosecution, and whether the introduction of that evidence prejudiced Ryan and requires that his conviction be vacated.

I.     **Harmless Error Review of Honest Services Mail Fraud Charges**

As noted, Ryan challenges the instructions given to the jury in this case. He argues that they improperly presented a theory of honest services fraud that is no longer valid after *Skilling*. He contends, further, that error in the instructions was not harmless and that the court must accordingly vacate Ryan's conviction on the mail fraud and RICO counts.

A.     **Standard of Review**

Error in jury instructions does not automatically require that a conviction be vacated. As the *Skilling* Court explained, where a jury returns a general verdict that may rest on a legally invalid theory, the conviction may be upheld under a harmless-error analysis. 130 S. Ct. at 2934. Harmless error review means that "[a]ny error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." FED. R. CRIM. P. 52(a). *Skilling* cited *Hedgpeth v. Pulido*,

129 S. Ct. 530, 531 (2008), where the Court instructed that "a reviewing court finding such error should ask whether the flaw in the instructions 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Hedgpeth*, 555 U.S. 57, 129 S. Ct. 530, 531 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993)), cited in *Skilling*, 130 S. Ct. at 2934 n.46.  That standard, the Court made clear, applies on direct review of a conviction as well as on collateral review.  *Id.* at 2834 n.46.

Ryan draws a further distinction; he argues that the *Brecht* harmless error standard does not apply because this case does not involve collateral review of a state-court proceeding, but rather post-conviction review of a federal proceeding.  He contends that "[t]he federalism concerns that prompted *Brecht* are absent in Section 2255 proceedings brought by federal prisoners." (Pet.'s Br. at 26.)  Ryan argues for application of the standard articulated by the Seventh Circuit in *Lanier v. United States*, 220 F.3d 833, 839 (7th Cir. 2000): that the conviction should be overturned unless it is "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *Id.* at 839.  The Government argues that *Lanier* "applied the heightened standard without analysis" and notes that no Circuit has applied a less deferential standard for Section 2255 motions after specifically considering the standard of review issue.  (Response Br. at 13-14 n. 7.) This court notes that *Lanier* cited *Neder v. United States*, 527 U.S. 1 (1999), where the Court explained that when an element of the offense was omitted from the jury instructions, the reviewing court "asks whether the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element," and if the answer is "no," the error is harmless.  527 U.S. at 19.

In two recent cases, the Seventh Circuit has used a harmless error test to uphold convictions challenged as inconsistent with *Skilling*. *Black v. United States*, 130 S. Ct. 2963 (2010), a companion case to *Skilling*, was remanded for a determination of whether the convictions of Conrad Black and his co-defendants for honest-services fraud could be upheld under an alternative theory of "money-property fraud."  On remand, the Seventh Circuit noted that a bribery or kickback

scheme "was not proved here," but observed that the defendants' convictions could nevertheless be upheld "if it is not open to reasonable doubt that a reasonable jury would have convicted [Black] of pecuniary fraud . . . ." *United States v. Black*, 625 F.3d 386, 388 (7th Cir. 2010), *reh'g en banc denied*, No. 08 CR 727 [117] (7th Cir. Dec. 17, 2010). In *United States v. Cantrell*, 617 F.3d 919 (7th Cir. 2010), the Seventh Circuit upheld an honest services conviction on direct appeal without articulating a standard of review because the charged conduct "was clearly a kickback scheme," so the honest services statute applied, even as narrowed by *Skilling*. *Id*. at 921.

*Black* is directly on point. This court reviews the conviction under a harmless error standard and asks whether it is beyond a reasonable doubt that a reasonable jury[6] would have convicted Ryan of a legally valid theory on which it was properly instructed.

### B. *Skilling* Standard

Before addressing the propriety of the instructions in this case, the court pauses to review the theory of honest services fraud post-*Skilling*. The defendant in *Skilling* was charged with "conspiring to defraud Enron's shareholders by misrepresenting the company's fiscal health, thereby artificially inflating its stock price." 130 S. Ct. at 2934. As a result, the Government alleged, Skilling profited from the sale of Enron stock to the tune of $89 million. No allegation of any bribery or side payments was made, however, and the Court concluded that Skilling's conduct could not constitute honest services fraud. Because the indictment alleged not only honest services fraud, but also pecuniary fraud and securities fraud, the Court remanded the case for a determination of

---

[6]     In addition to inquiring as to what a "reasonable jury" would have found, the court also takes into account the actual findings of the jury in this case to the extent they demonstrate what the jury must have believed. *See Black*, 625 F.3d at 393 (noting that had the jury believed failure to disclose fees constituted honest-services fraud it would have convicted on all counts; since it did not, it must have believed that the conduct at issue constituted pecuniary fraud or it would not have convicted); *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993) ("Harmless-error review looks, we have said, to the basis on which 'the jury *actually rested* its verdict.' . . . The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error.") (citation omitted; emphasis in original).

whether the verdict would survive harmless error analysis.  *Id.* at n.46.

Skilling asked the Supreme Court to strike down § 1346 on vagueness grounds, but the Court chose instead to limit its scope.  "Interpreted to encompass only bribery and kickback schemes, § 1346 is not unconstitutionally vague."  *Id.* at 2933.  The Court did not offer a specific definition of the types of bribery and kickback schemes prohibited by the honest services statute, but instead noted that the "prohibition on bribes and kickbacks draws content not only from the pre-*McNally* case law, but also from federal statutes proscribing–and defining–similar crimes."  *Id.* The court pointed to several federal statutes defining bribery and kickback schemes (18 U.S.C. §§ 201(b), 666(a)(2); and 41 U.S.C. § 52(2)) and identified several cases that define bribery in the context of honest services fraud.  This court relies on these sources for a definition of honest services bribery that survives post-*Skilling*.

First, one of the cited statutes, 18 U.S.C. § 201(b), explains in part that the elements of bribery are satisfied when an individual

> directly or indirectly, corruptly gives, offers or promises anything of value to any public official . . . with intent . . . to influence any official act; or . . . to induce such public official . . . to do or omit to do any act in violation of the lawful duty of such official . . . .

The elements are also satisfied when a public official

> directly or indirectly, corruptly demands, seeks, receives, accepts, or agrees to receive or accept anything of value personally or for any other person or entity, in return for . . . being influenced in the performance of any official act . . . [or] being induced to do or omit to do any act in violation of the official duty of such official or person . . . .

18 U.S.C. § 201(b)(1)(A)-(C), (2)(A)-(C).  Likewise, 18 U.S.C. § 666, explains that bribery occurs whenever an individual

> corruptly gives, offers, or agrees to give anything of value to any person, with intent to influence or reward an agent . . . of a State . . . in connection with any business, transaction, or series of transactions of such organization, government, or agency . . . .

18 U.S.C. § 666(a)(2).

As the case law cited by the Supreme Court reflects, a showing of bribery need not include direct *quid pro quo* exchange; two of the three cases cited by the Court as examples of honest services bribery rest on a "stream of benefits" bribery theory. In a Third Circuit decision upholding a conviction for public corruption, the court approved jury instructions that explained, "where there is a stream of benefits given by a person to favor a public official, . . . it need not be shown that any specific benefit was given in exchange for a specific official act. If you find beyond a reasonable doubt that a person gave an official a stream of benefits in implicit exchange for one or more official acts, you may conclude that a bribery has occurred." *United States v. Kemp*, 500 F.3d 257, 281 (3d Cir. 2007), cited in *Skilling*, 130 S. Ct. at 2934. The *Kemp* court re-stated this theory to explain that, "[w]hile the form and number of gifts may vary, the gifts still constitute a bribe as long as the essential intent–a specific intent to give or receive something of value in exchange for an official act–exists." *Kemp*, 500 F.3d at 282 (emphasis omitted).

Similarly, in *United States v. Whitfield*, 590 F.3d 325 (5th Cir. 2009), cited in *Skilling*, 130 S. Ct. at 2934, the Fifth Circuit upheld an honest services bribery conviction under a "stream of benefits" theory. The jury charge required that jurors find "a corrupt agreement for [defendant] to provide the particular judge with things of value specifically with the intent to influence the action or judgment of the judge on any question, matter, cause or proceeding which may be then or thereafter pending subject to the judge's action or judgment." 590 F.3d at 353. The court noted that the government did not need to prove the parties had a specific case in mind when the exchange took place, and specifically dismissed the contention that the instruction should have required the jurors to find a "*quid pro quo*": "Despite the district court's failure to include the actual phrase *quid pro quo* in the jury charge, in the instant context the instructions sufficiently conveyed the 'essential idea of give-and-take.'" *Id.* (citing *United States v. Kincaid-Chauncey*, 556 F. 3d 923, 943 (9th Cir. 2009)).

The "stream of benefits" theory has been a viable basis for convictions on bribery and

extortion charges for some time, and has sometimes been referred to as supporting such charges under a "course of conduct" or "retainer" theory. *See, e.g.*, *United States v. Jennings*, 160 F.3d 1006, 1014 (4th Cir. 1998) ("The quid pro quo requirement is satisfied so long as the evidence shows a course of conduct of favors and gifts flowing to a public official in exchange for a pattern of official actions favorable to the donor.") (internal quotation and citation omitted); *United States v. Kincaid-Chauncey*, 556 F.3d 923, 943 (9th Cir. 2009) (honest services bribery can be established if "the government official has been put on 'retainer'—that is, that the government official has received payments or other items of value with the understanding that when the payor comes calling, the government official will do whatever is asked.").

### C. The Jury Instructions

Ryan contends that the jury instructions in this case were flawed in five different respects: (1) He asserts the instructions are flawed by their reliance on the *Bloom* standard, *see United States v. Bloom*, 149 F.3d 649 (7th Cir. 1998), which was rejected in *Black*; (2) he claims the jury was instructed that the prohibition on accepting bribes or kickbacks was just one violation that could support an honest services conviction, while *Skilling* established that it is the only violation that can support such a conviction; (3) he urges that the instructions do not adequately express the requirement of a showing of *quid pro quo* exchange; (4) Ryan asserts that the instructions permitted a conviction on the basis of a conflict of interest, a showing insufficient after *Skilling*; and (5) he argues that the instructions permitted a conviction on the basis of state-law violations, also not sufficient after *Skilling*. (Pet.'s Br. at 21.) The Government urges that there was no error because the instructions, read as a whole, did require the jury to find that Ryan took bribes or kickbacks in order to convict him.

An instructional error can occur in a variety of ways—including, for example, an instruction on an invalid alternative theory of guilt, or an instruction that omits or erroneously describes an element of the offense. *United States v. Marcus*, 130 S. Ct. 2159, 2165 (2010). Even if an

instructional error has occurred as to some element of the charge, reversal is required "only if the instructions, 'viewed as a whole, misguide the jury to the litigant's prejudice.'" *United States v. Palivos*, 486 F.3d 250, 257 (7th Cir. 2007) (describing harmless error analysis, and citing *United States v. Souffront*, 338 F.3d 809, 834 (7th Cir. 2003)).

### 1. The *Bloom* Standard

Ryan's first challenge to the instructions is their incorporation of what he refers to as the *Bloom* standard.[7] The instruction at issue stated:

> Where a public official misuses his official position or material nonpublic information he obtained in it for private gain for himself or another, then that official or employee has defrauded the public of his honest services if the other elements of the mail fraud offense have been met.

(Tr. 23911.)

The trial judge gave a similar instruction in *Black*: she instructed the jury that "a person commits honest-services fraud if he 'misuse[s] his position for private gain for himself and/or a co-schemer' and 'knowingly and intentionally breache[s] his duty of loyalty.'" *Black*, 130 S. Ct. at 2967. The Supreme Court concluded that these instructions were flawed because the "scheme to defraud alleged [in *Black*] did not involve any bribes or kickbacks," *id.* at 2968 n.7, and accordingly remanded for a determination of whether the instructional error was harmless. The *Black* Court did not consider or address what instruction would have been appropriate if the scheme to defraud *had* rested on a bribery or kickback theory.

On direct appeal in this case, the Seventh Circuit noted that the conflict-of-interest instruction challenged by Ryan included language requiring the jury to find not only a conflict of interest but also to find that "the other elements of the mail fraud statute are met." *United States v.*

---

[7]     This instruction derives from *United States v. Bloom*, 149 F.3d 649, 656-57 (7th Cir. 1998), in which the Seventh Circuit held that the mere breach of a fiduciary duty did not constitute honest-services fraud, and that "[a]n employee deprives his employer of his honest services only if he misuses his position (or the information he obtained in it) for personal gain." *Id.*

*Warner*, 498 F.3d 666, 698 (7th Cir. 2007). The Seventh Circuit was satisfied that the addition of this requirement meant that the government was required to prove "that the public official allowed or accepted the conflict of interest with the understanding or intent that she would perform acts within her official capacity in return." *Id.* That same language is included as part of the *Bloom* instruction that Ryan challenges in the pending motion. The instruction did not limit the prohibited conduct to bribery or kickback schemes, however, and could also be interpreted as an instruction that a scheme of self-dealing itself violates the law—no longer a valid theory of honest services fraud post-*Skilling.* The court concludes the instruction was in error. No self-dealing offense was actually charged, however, and whether this error is harmless or not will be considered below.

### 2. Duty Not to Accept Bribes or Kickbacks Was Non-Exclusive

Ryan next argues that the instructions were flawed because they explained that the duty not to accept bribes or kickbacks was only one of the duties whose violation could lead to an honest services conviction, while *Skilling* makes clear that a bribery or kickback scheme is the only scheme sufficient to support an honest services fraud conviction. (Pet.'s Br. at 21.) The instruction at issue explained that a public official has a duty not to accept "personal and financial benefits with the understanding that the public official would perform or not perform acts in his official capacity in return." (Instructions at 85; Tr. 23906.) Ryan also urges that the "structure" of the instructions was flawed because they "made the acceptance of a bribe or kickback only one path to conviction rather than the only one." (Pet.'s Br. at 22.)

Ryan is correct that, post-*Skilling*, an honest services fraud conviction does require a bribery or kickback scheme. As the court reads the challenged instruction, however, nothing in it suggests such a scheme is not a required path to conviction. In fact, this instruction taken alone suggests that a bribe *is* required for conviction. The instruction requires that "the government prove[] beyond a reasonable doubt that the public official accepted the personal and financial benefits with the understanding that the public official would perform or not perform acts in his official capacity in

14

return" (Instructions at 85; Tr. 23906)—an instruction indistinguishable from a bribery instruction.

The court finds no error in the language of this instruction; whether a flaw in the overall "structure"

of the instructions requires reversal will be addressed as part of the harmless error analysis.

### 3. The Failure to Require a *Quid Pro Quo*[8]

---

[8] The Government argues that Ryan has waived or forfeited his challenges to three of the instructions in this section. (Response Br. at 19 n.12.) First, the Government argues that Ryan himself proposed the instructions he now challenges as improperly omitting a *quid pro quo* requirement and thus has waived any challenges to them. *See* discussion *infra*. "The right to object to jury instructions on appeal is waived if the record illustrates that the defendant approved of the instructions at issue." *United States v. Griffin*, 84 F.3d 912, 924 (7th Cir. 1996). *See also United States v. Yu Tian Li*, 615 F.3d 752, 757 (7th Cir. 2010) ("Having proposed a jury instruction virtually identical to the instruction actually used by the district court, [the defendant] cannot now contest that instruction.").

As the record shows, Ryan's attorneys did propose these two instructions (Def.'s Second Supp. to Proposed Jury Instructions [703] at F, G), and did not object when they were modified (Tr. 22459, 22465) to correspond to instructions related to the Illinois bribery statute, to which Ryan also did not object. (Tr. 22434-40; 22442-43.) Ryan nevertheless argues that his objection was preserved because he originally sought a campaign contribution instruction that did require an explicit *quid pro quo*. (Reply Br. at 9 n.5.) The Government has not raised a waiver argument with respect to the campaign contribution instruction, however. And Ryan's argument that he "sought instructions that would come within hailing distance of the standard he favored while respecting the Court's ruling" is not consistent with the record: During the instructions conference, Ryan's lawyers did pose multiple objections to the campaign contributions instructions despite the court's earlier rulings (Tr. 22275-22288; 22446-22449; 22461), but made none with respect to the instructions at issue here.

Ryan further argues that he "could not have presented at trial the objection he now offers to the 'financial benefits' instructions" because *Skilling* had not been decided. (Reply Br. at 9 n.5.) This argument has traction. *See Waldemar v. United States,* 106 F.3d 729, 731 (7th Cir. 1996) (a defendant who fails to raise a claim at trial may not proffer it as grounds for collateral attack without good cause; but good cause exists where "intractable federal precedent" in effect at the time of trial would have rendered his objection futile); *Bateman v. United States*, 875 F.2d 1304, 1308 (7th Cir. 1989) (§ 2255 petition not barred by procedural default because *McNally* "did indeed represent the type of startling break with past practices so as to excuse procedural default on collateral attack of a conviction."). In any event, even if Ryan had waived his objections to these instructions, the court would still review them for plain error. FED. R. CRIM. P. 52(b) ("A plain error that affects substantial rights may be considered even though it was not brought to the court's attention."). Moreover, the Supreme Court suggested in *Skilling* that instructional errors in this context are subject to harmless error review without any discussion of waiver. Because the harmless error review is more favorable to Ryan than plain error review would be, the court need not also engage in plain error review.

The Government also argues that Ryan has procedurally defaulted on any challenge to the instruction explaining that the receipt of benefits to "ensure favorable official action when necessary" can be sufficient to establish honest services fraud (Instructions at 86; Tr. 23906),

(continued...)

Ryan's next objection challenges the instruction examined above (Instructions at 85; Tr. 23906), as well as the instruction on campaign contributions. Ryan argues that the "personal and financial benefits" instruction is flawed in two respects: first, that it does not require jurors find an "exchange" sufficient to meet the *quid pro quo* requirement; and second, that the latter half of the instruction might encompass gratuities as well as bribes. Ryan next argues that the campaign contribution instruction is in error because it does not require an explicit *quid pro quo*. In its entirety, the instruction on "personal and financial benefits" reads:

> The law does not require that the government identify a specific official act given in exchange for personal and financial benefits received by the public official so long as the government proves beyond a reasonable doubt that the public official accepted the personal and financial benefits with the understanding that the public official would perform or not perform acts in his official capacity in return.

> Likewise, the law does not require that the government identify a specific official act given in exchange for personal and financial benefits received by the public official so long as the government proves beyond a reasonable doubt that the personal and financial benefits were given with the understanding that the public official would perform or not perform acts in his official capacity in return.

(Instructions at 85; Tr. 23905-06.) Ryan argues that this instruction improperly eliminated any *quid pro quo* requirement because it "turned on the understanding of one person—the public official—rather than on whether the two parties had agreed to an exchange." (Pet.'s Br. at 23.) The court finds this argument unpersuasive. The instruction required the public official to accept a benefit with the understanding he will perform an action in return. Such an understanding necessarily requires a second party to the exchange. The language requiring that the act be performed "in return" underscores the instruction's requirement that there be an agreed exchange.

---

[8](...continued)
because, though he objected to it, he failed to challenge it on direct appeal. The Government cites *United States v. Podhorn*, 549 F.3d 552, 558 (7th Cir. 2008), for this proposition, but that case does not discuss the effect of failing to preserve a challenge on appeal. *Podhorn* discussed the effect of failure to object during a jury instructions conference. The court declines to search for further precedent on this point because this instruction would be reviewed for plain error even absent harmless-error review, and, as discussed *infra*, the conviction withstands a challenge under either standard.

Further, the predicate language does include the term "in exchange," and notes that while the exchange need not involve "a specific official act" it must include "acts . . . in return." This language adequately articulates the *quid pro quo* requirement.

Next, Ryan contends that the instruction explaining what provision of benefits does not violate the mail fraud statute incorrectly suggests that a gratuity might serve to violate the statute as well as a bribe. The instruction reads:

> [T]he providing of personal or financial benefits by a private citizen to and for the benefit of a public official, or to and for the benefit of a public official's family, friends, employees, or associates, does not, standing alone, violate the mail fraud statute, even if the private citizen does business with the state, so long as the personal or financial benefits were not intended to influence or reward the public official's exercise of office.

(Instructions at 87; Tr. 23907.) The Supreme Court has explained that the difference between a bribe and a gratuity is "its intent element." *United States v. Sun-Diamond Growers of California*, 526 U.S. 398, 404 (1999) (interpreting 18 U.S.C. § 201). While a bribe requires an intent to influence, or to be influenced, a gratuity "requires only that the gratuity be given or accepted 'for or because of' an official act.'" *Id.* at 405. The instruction's language limiting illegal benefits to those "intended to influence or reward the public official's exercise of office" is the language of bribery. Inclusion of the term "reward" in addition to "influence" is necessary to capture instances where the benefit arrives after the act. Ryan appears to urge that a "reward" must be understood to be a gratuity, but the word reward itself is used in one of the federal bribery statutes, 18 U.S.C. § 666, which explains that bribery occurs whenever an individual "corruptly gives, offers, or agrees to give anything of value to any person, with intent *to influence or reward* an agent . . . in connection with any business, transaction, or series of transactions of such organization, government, or agency. . . ." 18 U.S.C. § 666 (a)(2) (emphasis added). This language is virtually identical to that contained in the instruction, and the court finds no error in the instruction.

Next, Ryan challenges the instruction that permitted the jury to find the intent necessary for

a conviction of honest services fraud from evidence of a "benefit or benefits received by a defendant or given by a defendant with the intent that such benefit or benefits would ensure favorable official action when necessary . . . ." (Instructions at 86; Tr. 23906; Pet.'s Br. at 24 n.15.) Ryan insists such a showing is insufficient to establish intent. Instead, he argues, "the benefit must be conferred or received in exchange for something. An intent to ensure favorable action when necessary is not enough." (Pet.'s Br. at 24 n.15.) The case law, however, defeats Ryan's interpretation. In *United States v. Gorny*, 732 F.2d 597 (7th Cir. 1984), for example, the jury instructions included an instruction similar to this one, based on the Illinois bribery statute. The instruction stated:

> [B]ribery occurs when property or personal advantage is accepted by a public employee with knowledge that it is offered with intent to influence the performance of any act related to his public position. No particular act need be contemplated by the person offering the property or personal advantage, or by the public official to whom the offer is made. The crime is completed when the property or personal advantage is accepted by the public employee knowing it was offered with the intent that he act favorably to the person offering the property or personal advantage when necessary.

732 F.2d at 600. *Gorny* affirmed the conviction of a deputy commissioner on a county board of tax appeals who received payments in cash and other advantages from attorneys who practiced before the board. Although Gorny did not receive payments "based on the outcome of any specific case," the Seventh Circuit confirmed his conviction of mail fraud and racketeering, noting that there was evidence from which the jury could find that "these payments and other favors were conferred upon Gorny with intent to influence him" and that Gorny received these favors with a similar intent. *Id.* at 600, 601. *See also United States v. Kincaid-Chauncey*, 556 F.3d at 944 n.15 ("when the payor comes calling, the government official will do whatever is asked."). This instruction is clearly consistent with the "stream of benefits" or retainer theory, and, together with the other benefits instructions, adequately expresses the *quid pro quo* requirement.

Finally, Ryan argues that the campaign contribution instruction does not adequately explain

the type of *quid pro quo* required for campaign contributions to constitute bribes. For purposes of campaign contributions, Ryan urges, the jury must find more than an implied exchange; there must be an "explicit quid pro quo." (Pet.'s Br. at 23.) The instruction at issue states:

> When a person gives and a public official receives a campaign contribution knowing that it is given in exchange for a specific official act, that conduct violates the mail fraud statute, if the other elements of the mail fraud offense are met. The intent of each party can be implied from their words and ongoing conduct.

(Instructions at 88; Tr. 23908.)

Ryan is correct that a campaign contribution can be deemed a bribe only if the money is given in return for a commitment to take (or not take) a specific action. In *McCormick v. United States*, 500 U.S. 257, 273 (1991), the Supreme Court held that a campaign contribution could constitute extortion in a Hobbs Act case, "but only if the payments are made in return for an explicit promise or undertaking by the official to perform or not to perform an official act." *Id.* A year later, the Court confirmed the *quid pro quo* requirement, but explained that "[t]he official and the payor need not state the *quid pro quo* in express terms, for otherwise the law's effect could be frustrated by knowing winks and nods. The inducement from the official is criminal if it is express or if it is implied from his words and actions, so long as he intends it to be so and the payor so interprets it." *Evans v. United States*, 504 U.S. 255, 274 (1992) (Kennedy, J., concurring).

The final sentence of the campaign contribution instruction in this case tracks Justice Kennedy's language in *Evans*, and therefore accurately articulates the standard for finding a *quid pro quo* based on campaign contributions. Moreover, as the Government noted in oral argument, *Evans* and *McCormick* were both settled law at the time this case went to the jury, and nothing in *Skilling* has unsettled them.

### 4. Conflict-of-Interest Instruction

Ryan next challenges the conflict-of-interest instruction given to the jury:

> A public official or employee has a duty to disclose material information to a public employer. If an official or employee conceals or knowingly fails to disclose a

material personal or financial interest, also known as a conflict of interest, in a matter over which he has decision-making power, then that official or employee deprives the public of its right to the official's or employee's honest services if the other elements of the mail fraud offense are met.

(Instructions at 84; Tr. 23905.) On direct appeal in this case, the Seventh Circuit examined this instruction to determine whether it comported with the "private gain" requirement imposed by this circuit's jurisprudence (but not by some other circuits). S*ee Skilling*, 130 S. Ct. at 2928 n.36. The Seventh Circuit was satisfied that the instruction at issue properly required the jury to find that the defendant public official had allowed or accepted a conflict of interest for his own private gain, with the intent to perform acts in his official capacity in return. *Warner*, 498 F.3d at 698.

The objection Ryan now presents is a different one: he notes that this instruction would permit the jury to convict him for self-dealing and other conflicted transactions that fall short of a bribery or kickback scheme. *Skilling*'s core holding precludes such a result. "In light of the relative infrequency of conflict-of-interest prosecutions in comparison to bribery and kickback charges, and the intercircuit inconsistencies they produced, we conclude that a reasonable limiting construction of § 1346 must exclude this amorphous category of cases." 130 S. Ct. at 2932. The court concludes that the conflict-of-interest instruction was in error.

### 5. State Law Violations

Ryan contends that the instructions allowed the jury to find he committed honest services fraud based on a violation of state law that did not involve a bribery or kickback scheme. The court's instructions did identify a number of state laws that govern the conduct of public officials, including the following:

- "Public funds, property or credit shall be used only for public purposes."

- Misconduct occurs when an official "performs an act in excess of his lawful authority" to "obtain a personal advantage for himself" or "knowingly accepts for the performance of any act a fee or reward which he knows is not authorized by law".

- A public official is required to file an annual financial disclosure statement

20

with the State of Illinois.

- "[A] public officer was prohibited from soliciting or accepting any gifts from any prohibited source or in violation of any federal or state statute, rule or regulation."

(Instructions at 89-90; Tr. 23908-23910.)  The court then explained that

> [N]ot every instance of misconduct or violation of a state statute by a public official or employee constitutes a mail fraud violation.  Where a public official or employee misuses his official position (or material, non-public information he obtained in it) for private gain for himself or another, then that official or employee has defrauded the public of his honest services, if the other elements of the mail fraud offense have been met.

(Instructions at 93; Tr. 23911.)  The Seventh Circuit also examined this instruction on direct appeal, again focusing on the requirement of a showing of personal gain.  The court noted that the "cited provisions of Illinois law identified for the jury various ways in which a public official could 'misuse his fiduciary relationship,' but the instructions as a whole unambiguously required the prosecution to prove that misuse of the office was intended for personal gain."  *Warner*, 498 F.3d at 698.  *See also United States v. Segal*, 495 F.3d 826, 834 (7th Cir. 2007) (rejecting challenge to state-law instruction in honest services prosecution because "state laws are useful for defining the scope of fiduciary duties, and . . . what distinguishes a mere violation of fiduciary duty from a federal fraud case is the misuse of one's position for private gain.").

Determining the duties of office can indeed be relevant to a bribery prosecution; for example, 18 U.S.C. § 201(b) requires that one of the elements of bribery is that an official "do or omit to do any act in violation of the lawful duty of such official."  State laws are directly relevant in determining the scope of an official's lawful duty.  This court was and is satisfied that the state law instruction did not permit the jury to convict Mr. Ryan of a federal defense solely for the violations of state law.  Still, one can misuse his office for private gain without engaging in a bribery or kickback scheme.  The court thus concludes that this instruction, too, is error in the light of *Skilling*.

D.       **Harmless Error Analysis**

Having determined that the *Bloom* instruction, the conflict-of-interest instruction, and the state law instructions should not have been given, the court turns to the question of whether these instructional errors were harmless. As explained previously, the relevant inquiry is whether a reasonable jury, properly instructed, must necessarily have convicted based on a proper theory. Put another way, the court asks whether the jury necessarily found the elements of the valid theory satisfied when it chose to convict on a now-invalid theory.

The court notes that this analysis would be significantly more straightforward had the Government argued solely a bribery theory at trial. The vast majority of post-§ 1346 and pre-*Skilling* honest services cases stem from one of two theories—bribery or self-dealing (usually in the form of an undisclosed conflict-of-interest for personal gain). The latter theory is the one on which Mr. Skilling himself was convicted. At first cut, this case appears to present a straightforward bribery theory—Ryan accepted benefits with the intent to be influenced in his official actions. Yet the Government insisted on arguing not only a bribery theory but also an undisclosed conflict-of-interest theory. During the jury instruction conference, Ryan's attorneys challenged the propriety of a conflict-of-interest instruction. Attorney Bradley Lerman argued:

> [T]he failure to disclose financial interest [doctrine] in the Seventh Circuit, that relates to the direct interest that the public official has and fails to disclose. If George Ryan was an owner, for example, of the Joliet property and he failed to disclose his ownership. . . . The fact pattern in this case is closer, much more analogous to the bribery fact pattern. . . . I have always assumed [ ] the theme of the government's case [was] the hidden flow of benefits between people who benefitted from George Ryan's activities.
>
> George Ryan doesn't have a personal financial interest in this case in the decisions that he was making as a public official. The allegation is that he was receiving things of value paid to influence him from people who were benefitting from his decisions.

(Tr. 22070, 22073.) The Government insisted that the conflict-of-interest instruction was appropriate in this case; such an instruction was relevant, for example, to Ryan's concealment on his economic interest forms of the benefits he received from Harry Klein "at the same time that he

is making official decisions that confer public benefits on Mr. Klein." (Tr. 22068.)

The Government's conflict-of-interest theory did go to the jury—had it not, *Skilling* would have provided little upon which Ryan could base the instant petition. But, as Ryan's attorney himself emphasized, the acts underlying either theory were the same—in one instance, a jury was invited to convict based on Ryan's failure to disclose the stream of benefits, and in another it was invited to convict based on the stream of benefits themselves. The court declines, at this stage, to discuss whether the conflict-of-interest instruction was clear enough or necessary at all. The question for now is whether, in order to find Ryan guilty on one theory, the jury must have found him guilty on the other, as well. The legal characterization of the charge is irrelevant so long as the jury found beyond a reasonable doubt that Ryan had engaged in the conduct charged.

Ryan's main defense to the mail fraud charges was that, while he may have done political favors for his friends, including co-Defendant Warner, such activity does not amount to a crime. Thus, Ryan's attorney argued in closing,

> It's a crime if George Ryan accepted benefits to perform official acts. But it's not a crime if all George Ryan did is try to do things that sometimes benefited political supporters. That happens . . . . No witness testified that George Ryan accepted personal or financial benefits to perform official acts. That is so critical . . . . Everyone wants this to be some evil thing. Okay. Maybe the world should work different. Okay. Maybe public officials should never be able to do anything to favor their supporters. Maybe we ought to change the whole way the whole political system in America works. Maybe we should do that. But that's not the way it is. And it's not a crime to help your friends.

(Tr. 23159-60, 23177, 23343.)

Ryan requested, and the jury received, numerous instructions tailored to this theory of defense. The jury was instructed that "[a] public official's receipt of personal or financial benefits . . . does not, standing alone, violate the mail fraud statute, even if the individual providing the personal or financial benefit has business with the state." (Instructions at 87; Tr. 23906-07.) The jury was also told that, "[g]ood faith on the part of the defendant is inconsistent with intent to defraud, an element of the mail fraud charges." (Instructions at 81; Tr. 23905.) Another instruction

explained that a "public official may receive campaign contributions from those who might seek to influence the candidate's performance as long as no promise for or performance of a specific official act is given in exchange," and that campaign contributions from those who "[have] or expect[] to have business pending before the public official" do not necessarily violate the mail fraud statute. (Instructions at 88; Tr. 23907.)  Further, the court identified a number of items that a public official could properly receive without violating the law, including "anything provided on the basis of personal friendship, unless the officer had reason to believe the gift was provided because of the official position of the officer, and not because of friendship."  (Instructions at 90; Tr. 23909-10.)

As discussed below, the court is satisfied that these instructions required the jury to find that that Ryan did not act in good faith, that he acted for private gain[9], and that the "stream of benefits" flowing between Warner and Ryan were not simply the proceeds of a friendship, as Ryan argued, but were intended to influence him in his official duties.  *United States v. Ochoa-Zarate*, 540 F.3d 613, 620 (7th Cir. 2008) ("We presume that the jury followed the court's instructions.").  Because such findings are sufficient to establish a bribery scheme, the court is further satisfied that the instructional errors identified above were harmless.  These conclusions are explained in greater detail below.

### 1.     Single Scheme to Defraud

In *McNally v. United States*, 483 U.S. 350 (1987), the Supreme Court held  held the "honest services" theory of mail fraud unconstitutional.  In the wake of *McNally*, the Seventh Circuit re-

---

[9]     The Seventh Circuit explained that "the instructions as a whole unambiguously required the prosecution to prove that misuse of the office was intended for personal gain . . . ." *Warner*, 498 F.3d at 698.  The court notes that "personal gain" might be considered more limited than "private gain," although this difference is probably inconsequential. *United States v. Sorich*, 523 F.3d 702, 709 (7th Cir. 2008) ("The semantic difference between 'private' and 'personal' gain may be insignificant, but to the extent that 'personal' connotes gain only by the defendant, it is misleading.  By 'private gain' we simply mean illegitimate gain, which usually will go to the defendant, but need not.").  Ryan does not dispute that, even post-*Skilling*, whatever constitutes the gain, be it personal or private, may be actually given to another so long as there is a resulting "gain" to Ryan.

examined a number of convictions to determine whether they remained valid. These cases provide a useful framework for examining Ryan's conviction in light of the *Skilling* decision. In one particularly instructive case, *Messinger v. United States*, 872 F.2d 217 (7th Cir. 1989), the court recognized that the honest services theory under which Messinger had been convicted was no longer valid, but examined whether Messinger might also have been convicted on a pecuniary fraud theory. The court explained that it would "examine the indictment, the evidence, and the jury instructions to see if the jury necessarily had to convict Messinger for defrauding Cook County of its property right . . . notwithstanding any intangible rights theory employed." *Id.* at 221. *See also United States v. Bonansinga*, 855 F.2d 476, 479 (7th Cir. 1988) ("[R]egardless of the language employed in his indictment, the fact remains that the evidence adduced by the government at trial unequivocally demonstrated Bonansinga's participation in conduct clearly proscribed by the mail fraud statute as construed in *McNally*."); *United States v. Wellman*, 830 F.2d 1453, 1463 (7th Cir. 1987) ("[E]ven assuming these allegations were (in form at least) separate, the government could not logically prove one scheme without proving the other since the elements of the two were identical.").

The *Messinger* court undertook this analysis because in that case the jury found the existence of a single scheme to defraud, and convicted *Messinger* based on acts in furtherance of that scheme. This case presents a similar situation. In order to convict Ryan, the jury must have found the existence of a scheme to defraud, and must have found, on each of the mail fraud counts of conviction, a mailing in furtherance of that scheme. The first question is whether the jury's finding that this scheme existed necessitated a finding that it was a bribery or kickback scheme. If so, the court can end its inquiry because the jury, as in *Messinger*, would necessarily have found a violation that falls within the narrowed definition of mail fraud approved by the Supreme Court.

### a. Did the jury necessarily find a bribery or kickback scheme?

The fact that the indictment and instructions did not exclusively track *Skilling*'s limited

definition of honest services fraud is not fatal to this analysis. In the post-*McNally* era, courts in this circuit routinely found that indictments that included broad intangible rights language did not necessarily exclude an alternative, valid theory. *Messinger*, 872 F.2d at 221 ("In examining the indictment, we must look at the substance of the actions alleged, not at the language used."); *United States v. Folak*, 865 F.2d 110, 113 (7th Cir. 1988) ("The presence of some language referring to an intangible rights theory is not always fatal to the indictment."); *United States v. Gottlieb*, 738 F. Supp. 1174, 1181 (N.D. Ill. 1990) ("A court must look past the indictment's legal characterization of a scheme and determine whether the 'specific conduct alleged in the indictment is clearly proscribed by the mail fraud statute.' . . . In fact, the substantive allegations in an indictment may be cognizable under *McNally* even if the indictment is couched in 'intangible rights' language.") (quoting *United States v. Wellman*, 830 F.2d 1453, 1463 (7th Cir. 1987)).

The summary indictment provided to the jury in this case[10] alleged that Ryan

> devised and intended to devise, and participated in, a scheme and artifice to defraud the people of the State of Illinois, and the State of Illinois, of money, property and the intangible right to honest services of defendant Ryan and other official and employees of the State of Illinois, by means of materially false and fraudulent pretenses, representations, promises and material omissions, and in furtherance thereof used the United States mails and other interstate carriers.

The indictment went on to further describe the scheme in three additional paragraphs labeled "Overview of Scheme," which, in addition to the language below, included specific examples of actions illustrating the components of the scheme:

> 3.      It was part of the scheme that defendant Ryan performed and authorized official actions to benefit the financial interests of Ryan, defendant Warner, Arthur Ronald Swanson, Harry Klein and Donald Udstuen and designated third parties including Ryan family members and Citizens for Ryan.
>
> . . .

---

[10]      For the purposes of this opinion, the court examines the "summary of second superseding indictment" that was provided to the jurors. "In reviewing the indictment, the evidence, and the jury instructions, our 'inquiry is limited to a review of the case as it was presented to the jury and not how it might have been presented.'" *Messinger*, 872 F.2d at 221 (quoting *Magnuson v. United States*, 861 F.2d 166, 168 (7th Cir. 1988)).

4.      It was further part of the scheme that defendant Ryan and certain third parties affiliated with Ryan received personal and financial benefits from defendant Warner, Arthur Ronald Swanson and Donald Udstuen, while defendant Ryan knew that such benefits were provided with intent to influence and reward Ryan in the performance of official acts.

. . .

5.      It was further part of the scheme that . . . defendants Ryan, Warner, Arthur Ronald Swanson, and Donald Udstuen concealed their financial relationships . . .

As this court reads the indictment's language, Paragraph 5 presents a conflict-of-interest theory that, standing alone, would not satisfy *Skilling.* Paragraph 3 alleges a theory consistent with bribery, although one that does not necessarily constitute bribery in every instance. Paragraph 4, however, does contains a description that necessarily includes the "stream of benefits" theory of bribery discussed above. Thus, the indictment did present at least one theory of honest services fraud that remains valid post-*Skilling.*[11]

The elements of mail or wire fraud are "(1) a scheme to defraud (entailing a material misrepresentation), (2) an intent to defraud, and (3) the use of the mails." *United States v. Sorich*, 523 F.3d 702, 708 (7th Cir. 2008). In addition, for an honest services mail fraud charge in the Seventh Circuit, the Government was also required to show the misuse of position for private gain. *Id.* These requirements correspond to the outline of the scheme charged in the Ryan indictment: the first paragraph speaks of the acts involved in the scheme and the object of the frauds; the

---

[11]      The parties devoted substantial attention to these three paragraphs during the jury instructions conference. Ryan argued that the "intent to influence" language must be inserted in paragraph 3. (Tr. 22761-75.) The Government argued that would be unnecessary because it would be clear from all of the instructions that the jury must find each paragraph in the "Overview of Scheme" section satisfied in order to convict. (*Id.*) The parties agreed to keep the original language of the indictment, but delete a paragraph from one of the Government's proposed instructions to the effect that the jury that must unanimously find a false representation, but that "the government is not required to prove all of them." (*Id.*) During this conference, Ryan seemed most concerned that the jurors would find the awarding of a contract sufficient to establish guilt, without any *quid pro quo.* Defendants did not raise any objection to the concealment language believing that the jurors would not be misled "because paragraph [4] has the *quid pro quo* language in it and paragraph [5] has the concealment language." (Tr. 22766.)

second paragraph refers to the private gain reaped from the scheme; and the third paragraph describes the material misrepresentations upon which the scheme relied. Each additional mail fraud count in the indictment then detailed the mailing requirement

Does the fact that the jury found that a fraud scheme existed mean, therefore, that the scheme involved bribery or kickbacks? With respect to the mail fraud charges, the jury was instructed that they were required to find that "the defendant knowingly devised or participated in the scheme to defraud or to obtain money or property by means of materially false pretenses, representations, or promises, *as charged*." (Instructions at 75; Tr. 23902) (emphasis added). The instructions further explained that "[a] scheme to defraud is a scheme that is intended to deceive or cheat another and to obtain money or property or cause the potential loss of money or property to another or to deprive the people of the State of Illinois of their intangible right to the honest services of their public officials or employees." (Instructions at 76; Tr. 23903.) As the court reads this language, it did not on its face require the jurors to find that the charged scheme was one involving bribery.

In addition, the jury was instructed that the mail fraud counts "charge that the defendants participated in a single scheme to defraud" and that to find the defendant guilty of a particular count, the jury must "find beyond a reasonable doubt that the proved scheme to defraud was included within the charged scheme to defraud . . . provided that all other elements of the mail fraud charge have been proved." (Instructions at 77; Tr. 23903.) Thus, although the jury was required to find that a charged scheme to defraud existed, no language within either the indictment or the jury instructions explicitly required the jurors to find that every part of the scheme described in the indictment necessarily existed. Case law supports the conclusion that, unless instructed otherwise, a jury need not have found that every part of an alleged scheme existed in order to find that the scheme as a whole existed. *See United States v. Reicin*, 497 F.2d 563, 568 (7th Cir. 1974) ("The issue is whether lack of [proof of one part of a mail fraud scheme], despite the presence of the other

28

elements of the scheme as alleged in the indictment, vitiates the conviction on [one count].  We

hold that it does not.  '[I]n most mail fraud prosecutions, there are numerous instances of allegedly

illicit conduct, all of which need not be proved to sustain a conviction.'") (quoting *Anderson v. United

States*, 369 F.2d 11, 15 (8th Cir. 1966); *United States v. Toney*, 598 F.2d 1349, 1355-56 (5th

Cir.1979) ("In mail fraud cases the government need not prove every allegation of fraudulent

activities appearing in the indictment.  It need only prove a sufficient number of fraudulent activities

to support a jury inference that there was a fraudulent scheme.").

It might be possible to read the jury instructions in this case as *requiring* that the jury find

the scheme to involve accepting gifts "with intent to influence" official acts.  The court declines to

construe the instructions this way, however, because there was no explicit instruction to this effect

and because the Government, in its closing rebuttal argument,[12] suggested such a finding was not

necessary.  *See, e.g.*, Tr. 23771 ("[T]his is the heart of the matter.  For the first ten counts of the

indictment, it is the heart of the matter.  It's about trust.  Mr. Ryan's honest services.  That's what

it's about. . . . So, folks, on this honest services, on this scheme, this first element, it can be met

with a conflict of interest.").

---

[12]     The court notes that the Government's closing was equivocal on this issue.  Thus, in rebuttal, the Government argued that an honest services mail fraud scheme could be established simply with a showing of conflict of interest.  In its main closing argument, however, the Government hammered on the bribery theory.  *See, e.g.*, Tr. 22831 ("This was a case in which George Ryan steered government contracts, leases, and money to Larry Warner and a select few group of individuals who were also providing George Ryan, his family and friends with various undisclosed benefits."); Tr. 22836 ("George Ryan, as a public official, had a duty to provide honest services to the people of the state of Illinois who had elected him.  And the evidence in this case has shown that he repeatedly violated that duty.  He violated that duty by giving state benefits, like contracts and leases, to his friends—Warner, Swanson, Klein—while at the same time they were providing various undisclosed financial benefits to him and his family and to his friends."); Tr. 22956-58 ("What the Government's case is about is that George Ryan received these financial benefits for himself and steered other benefits to third parties, benefits that were not disclosed to the public, from the very individuals and during the very time frame that George Ryan was steering these various people profitable and lucrative leases and contracts.  So it's this undisclosed flow of benefits that was charged in the indictment, it's this undisclosed flow of benefits that is in violation of the law, and it's this undisclosed flow of benefits that were proven in this case beyond a reasonable doubt.").

### b.     Does the conviction rest on a still-viable theory?

Because the jury need not have found every aspect of the charged scheme, the next question is whether the findings they did make support a still-viable theory of honest services fraud. In reviewing mail fraud convictions after *McNally*, courts in this circuit looked to whether one charged theory was "easily separable" from the other. *See, e.g.*, *United States v. Eckhardt*, 843 F.2d 989, 997 (7th Cir. 1988) ("Where a fraud scheme involves multiple objectives, some of which are insufficient to state an offense under *McNally*, the remaining charge or charges will be deemed sufficient to state the offense if they are 'easily separable' from the charges deemed insufficient. In such a case, those allegations which are insufficient to state an offense are mere surplusage, and do not taint the remainder of the indictment.") (citations omitted); *United States v. Folak*, 865 F.2d 110, 113 (7th Cir. 1988) ("[W]here an indictment alleges multiple schemes, some of which serve to defraud victims of property and others that deprive them of some intangible right, we have treated as surplusage any intangible rights theory of fraud that was 'easily separable' from allegations of a scheme to defraud of money or property. We have also held that where a single set of facts establishes both a scheme to defraud a victim of money or property, as well as a deprivation of some intangible right, *McNally* does not require setting aside the conviction.") (citations omitted). The Seventh Circuit undertook a similar inquiry in *Black*, when it determined that a money-property theory could be disentangled from an honest services theory, and determined that a reasonable jury would necessarily have upheld one count of conviction on a money-property theory. *Black*, 625 F.3d at 393.

The difficulty in this case arises because *Skilling* did not invalidate an entire theory of mail fraud, as *McNally* did, but rather eliminated all sub-theories of honest services fraud that do not require bribes or kickbacks. Thus, the court must separate the bribery theory on which Ryan was charged, and the jury instructed, from the invalid theories described above—including the *Bloom* theory, the conflict-of-interest theory, and the state law theories. In order to do this, the court will

examine the evidence presented at trial on each mail fraud count for which Ryan was convicted, and determine whether that set of facts could have supported a scheme in the indictment *other than* the bribery scheme. In each case, if it could have, the court must determine whether a reasonable jury could have convicted based on the alternate theory but not on the bribery theory. The evidence essentially established two "streams of benefits," one from Warner to Ryan (and his family members), and one from Harry Klein to Ryan. Because in the case of Warner, each "stream of benefits" "quid" is allegedly tied to multiple "quos," the court will first examine the benefits alleged to have been received by Ryan from Warner as a whole, and then examine the acts alleged to have been performed in return.

### 2. Warner-related Mail Fraud Counts

### a. Stream of Benefits from Warner to Ryan

In ruling on Ryan's post-trial motion, this court observed that "[t]he government introduced a great deal of evidence of Ryan's acceptance of gifts and benefits." *Warner*, 2006 WL 2583722, at *6. Specifically, the benefits flowing from Warner to Ryan included favorable construction and insurance benefits to Ryan's family members; investments in Ryan's son's business; and favorable financial treatment of Comguard, a business involving Ryan's brother. *Id.* As Ryan himself notes, Warner wrote a $3,185 check to pay for the band that played at Ryan's daughter's wedding and held two major fund-raisers for Ryan, raising a total of $250,000.[13] (Pet.'s Br. at 19.) The government also provided circumstantial evidence that Ryan received cash from Warner and others. *Warner*, 2006 WL 2583722, at *6. The jury need not have believed every one of these incidents occurred or that every incident had a corrupt purpose. As explained below, however, the jury must have believed that in several instances Warner did provide benefits to Ryan in exchange for acts. Moreover, Ryan's convictions on the false statement and tax charges mean that the jury

---

[13] As noted, the jury was instructed that campaign contributions are unlawful only if given in exchange for a specific official act.

must have believed he substantially understated his income and that he had a "personal financial relationship" with Warner.

### b. Count Two

Count Two of the indictment charged that the mailing of a check from the State of Illinois to American Detail & Manufacturing Co. ("ADM") was in furtherance of the scheme to defraud. The evidence at trial showed that Ryan intervened on Warner's behalf in order to get James Covert, head of the Secretary of State's vehicle-services division, to withdraw contract specifications that might have caused ADM to lose a valuable vehicle registration stickers contract. At the time, ADM was Warner's client, and prior to Ryan's direct intervention, Warner represented to Covert that he had "authority to speak for Secretary Ryan" and wanted ADM to retain the contract.

In ruling on the sufficiency of the evidence in support of this count, the court noted that jurors had been instructed that if Ryan had acted in good faith—he claimed that his instructions to Covert were motivated by legitimate law-enforcement concerns—they should not convict him on this count. The jurors convicted Ryan despite this instruction, and the court observed that "Ryan's direct intervention on Warner's behalf, and his attempt to conceal his intervention by directing Covert to withdraw the specifications quietly, amply support the jury's verdict with respect to Count Two." *Warner*, 2006 WL 2583722, at *6.

Paragraph 3 of the summary indictment describes the Warner transaction, charging that it was part of the scheme that Ryan "performed and authorized official actions to benefit the financial interests of . . . Warner. . . . The official actions Ryan performed and authorized included: Awarding, and authorizing the award of, contracts and leases, and intervening in governmental processes related thereto and causing contractual payments to be made to benefit the financial interests of defendant Warner." Paragraph 4 describes the receipt of benefits by Ryan, explaining that "[i]t was further part of the scheme that defendant Ryan and certain third parties affiliated with Ryan received personal and financial benefits from defendant Warner . . . while defendant Ryan

knew that such benefits were provided with intent to influence and reward Ryan in the performance of official acts."

In order to convict Ryan on Count Two, the jurors had to believe one of three theories: either (1) Ryan concealed a conflict-of-interest related to the ADM contract; (2) Ryan misused his office for private gain in discussing the contract with Covert; or (3) Ryan accepted benefits (bribes) from Warner in exchange for his intervention.

The first theory does not stand on its own. The only conflict of interest presented to the jury relating to ADM was Ryan's relationship with Warner and Warner's involvement in this contract. Therefore, if the jury found that Ryan concealed a conflict of interest (theory (1)), it necessarily had to find that he had misused his office for private gain (theory (2)), or that he had accepted benefits from Warner in exchange for favors relating to ADM (theory (3)). The misuse of office theory (2) might stand alone if the jury believed that Ryan decided for some illegitimate reason—unrelated to the benefits Warner provided to Ryan—to coerce Covert into withdrawing the specifications. But the only motivations Ryan had to interfere with this contract were for legitimate law-enforcement reasons, as the defense suggested, or to compensate Warner for the stream of benefits he provided, as the Government urged. The jury rejected the good faith motive. Accordingly, the jury could only have convicted him on this count if it believed that his conduct was a response to the stream of benefits. Ryan suggests that the only "private gain" he received for his intervention in this transaction was the approval of his friend. As explained earlier, however, the jurors must have rejected this argument; they were specifically instructed that if the benefits Ryan received from Warner were merely the proceeds of a friendship, they could not be the basis for a conviction. *See* I.D *supra*. The court concludes that the jury must have found Ryan accepted gifts from Warner with the intent to influence his actions.

The Government did present the awarding of contracts and leases in these terms. In closing, the Government urged:

> George Ryan, as a public official, had a duty to provide honest services to the people of the state of Illinois who had elected him. And the evidence in this case has shown that he repeatedly violated that duty. He violated that duty by giving state benefits, like contracts and leases, to his friends—Warner, Swanson, Klein— while at the same time they were providing various undisclosed financial benefits to him and his family and to his friends. The benefits included free vacations, loans, gifts, campaign contributions, as well as lobbying money that Ryan assigned or directed to his buddies. In short, Ryan sold his office. He might as well have put up a 'for sale' sign on the office.

Tr. 22836. Further, the Government presented a valid "stream of benefits," "retainer," or "course of conduct" bribery theory when it explained that

> this is not a case in which a public official had a specific price for each official act that he did, like a menu in a restaurant where you pick an item and it has a particular price. The type of corruption here—that type of corruption where you give me this, I will give you that, is often referred to as a *quid pro quo*. The corruption here was more like a meal plan in which you don't pay for each item on the menu. Rather, there is a cost that you pay, an ongoing cost, and you get your meals. And for Warner, Swanson, and Klein it was not a cash bar. This was an open bar during Ryan's terms as secretary of state and as governor.

Tr. 22852. While Ryan is correct that the Government also suggested Ryan could be convicted based on a conflict of interest, as explained earlier, that was not a tenable independent theory that would have supported conviction of Ryan on Count Two.

### c.      Counts Three and Eight

Counts Three and Eight both involve the steering of leases to Warner. In Count Three, the government charged that a mailing related to the State's lease of a Warner-owned building was in furtherance of the scheme. In evaluating the sufficiency of the evidence on this count, the court found that three witnesses "testified as to Ryan's (and Warner's) direct involvement. Ryan put Sherman in contact with Warner to look for a new site, and the jury could reasonably infer from Borisy's testimony that Ryan knew Warner owned the Joliet building at the time." *Warner*, 2006 WL 2583722, at * 8.

Count Eight similarly charged Ryan with mail fraud based on a mailing from the state to a company controlled by Warner, for the lease of a building in Bellwood by the office of the Secretary

of State. In evaluating the evidence on this count, this court pointed to "evidence from which the jury could have concluded that Ryan steered the lease to Warner, in a top-down fashion, and that the approval of his subordinate was a mere formality. Moreover, the layers of deception surrounding the transaction support the jury's finding that the Defendants acted with the requisite intent." *Id.* at *12.

The same analysis applied to Count Two applies here, and leads to the conclusion that absent good faith, the jury must have convicted Ryan on this count because he steered these leases to Warner in exchange for Warner's provision of benefits to Ryan. In other words, the lease was steered to Warner because he participated in a "stream of benefits" bribery scheme with Ryan. Ryan argues that the jury might have believed "that Ryan favored Warner in awarding leases and other business, but [that] did not indicate that Warner ever gave Ryan a bribe or a kickback." (Pet.'s Br. at 19.) The court disagrees. No reasonable jury would have believed that Ryan committed mail fraud by awarding these leases to Warner, but not believed that the lease was awarded in exchange for the benefits provided by Warner to Ryan. The jury believed that Ryan acted with the intent to defraud, and that Ryan "performed and authorized official actions" to benefit Warner's financial interests. As noted earlier, it rejected the argument that the benefits flowing from Warner to Ryan were innocent gifts from one friend to another. The evidence of benefits flowing from Warner to Ryan, and Ryan's significant involvement in the steering of these leases lead to one conclusion: that Ryan accepted the gifts from Warner with the intent to be influenced, and that these leases are the manifestation of that influence.

### d.    Count Four

Count Four charged that a check from IBM to a consulting company controlled by Ryan was mailed in furtherance of the scheme. The Government contended that Warner took advantage of information gleaned from his association with Ryan to profit through a consulting contract with IBM.

The court found sufficient evidence for a jury to find "that Warner's IBM proceeds were a direct result of the access to the SOS Office that Ryan gave Warner." *Warner*, 2006 WL 2583722, at *9.

This charge differs from those discussed earlier in that there is no suggestion that Ryan took any specific "action" related to the IBM contract—and the standard definition of bribery requires some sort of official action in exchange for the benefits received. A question left unanswered in *Skilling* is whether each act taken in furtherance of a bribery scheme must itself be an official act of the type that could support conviction of a bribery offense. *Skilling* spoke in terms of a bribery scheme, not in terms of specific acts of bribery. *Skilling*, 130 S. Ct. at 2931 ("The 'vast majority' of the [core] honest-services cases involved offenders who, in violation of a fiduciary duty, participated in bribery or kickback schemes."); *id.* at 2931 n.42 ("Apprised that a broader reading of § 1346 could render the statute impermissibly vague, Congress, we believe, would have drawn the honest-services line, as we do now, at bribery and kickback schemes."). In a case decided one month after the *Skilling* decision, the First Circuit found (in a decision in which Justice Souter joined the panel) that a state legislator who took payments in order to arrange meetings between health insurers and his client could constitute honest services fraud on a bribery theory, even absent payment for a vote or other explicit action. The court explained that

> [l]egislators can and do convene meetings of constituents and seek to settle quarrels among them; but taking a bribe for the use of one's governmental power is a different matter and within the ambit of honest services fraud. . . . What distinguishes this aspect of the case from some others is that the bribe was not for Celona to press or oppose legislation directly through his votes; rather, the purchased use of official power was the implied threat of such action–and also the potential use of influence over legislation in committee–that Celona conveyed largely by implication through the orchestrated meetings. But the distance between this and paying outright for legislative votes is not great: both involve the misuse of office.

*United States v. Urciuoli*, 613 F.3d 11, 16-17 (1st Cir. 2010), *cert. denied*, ___S. Ct.___, 2010 WL 4052920 (Nov. 15, 2010). *See also United States v. Seminerio*, No. S1 08 Cr. 1238 (NRB), 2010 WL 3341887, at *6 n.9 (S.D.N.Y. Aug. 20, 2010) ("[T]he Second Circuit rejects the notion that

the 'quo' in a *quid pro quo* must be a narrowly defined official act.") (citing *United States v. Middlemiss*, 217 F.3d 112, 120 (2d. Cir. 2000); 18 U.S.C. § 201(b) (defining bribery as accepting a thing of value to induce an official "to do or omit to do any act in violation of the official duty of such official.").

Though the specific act alleged here—the provision of access to material nonpublic information in return for benefits—may not have involved an "official act" of the type that commonly constitutes a plain-vanilla bribery charge, it is certainly misuse of office within the context of an honest services bribery scheme. *Seminerio* explained that Skilling was charged with failing to disclose a personal economic interest unrelated to the receipt of any payments, whereas "the conflict of interest that Seminerio was charged with failing to disclose was his receipt of a stream of 'corrupt payments'—i.e., bribes—in connection with, and with the intent to be influenced in, his actions as an Assemblyman." *Seminerio*, 2010 WL 3341887, at *6. The same reasoning applies here—the only conflict-of-interest Ryan failed to disclose was the receipt of benefits from Warner.

### e.    Count Five

Count Five charged that a check related to the ADM and IBM contracts was mailed in furtherance of the scheme. Specifically, Warner caused a company he controlled, Omega Consulting Group, to issue a check to a company controlled by Alan Drazek, American Management Resources. The check was sent to Udstuen, who sent the check to Drazek. Drazek cashed the check, kept a portion, and sent the rest to Warner. The court noted in examining this evidence that "[t]his arrangement served no purpose other than to disguise the provenance of the proceeds." *Warner*, 2006 WL 2583722, at *9. This count, like Count Four, did not identify a specific official action, but the mailing of the check was incident to the bribery scheme, and specifically to the ADM and IBM contracts. A reasonable jury must have found that if this mailing was in furtherance of the scheme, any conflict of interest being concealed was Ryan's role in interfering

with the ADM contract, and misusing his office with the IBM contract, in exchange for benefits from Warner and others.

### f. Count Seven

The Government charged in Count Seven that the mailing of a check from Viisage to a consulting firm controlled by Warner was in furtherance of the scheme to defraud.  As more fully explained in the court's ruling on Ryan's post-trial motions, regarding this count the "jury could reasonably have found that, by virtue of his relationship with Ryan, Warner obtained access to information about the digital licensing contract and secured a share of the profits for himself, and that Warner attempted to conceal his role." *Id.* at *11.  This count, like some others, rests on the disclosure of material nonpublic information.  Even post-*Skilling*, this court is comfortable in concluding that not every action in furtherance of an honest services bribery scheme must itself adhere to the elements of a paradigmatic bribery charge.  In this instance, as part of the flow of benefits running between Ryan and Warner, Ryan allowed Warner access to information from which he was allowed to profit.  Ryan's only interest in this was his financial relationship with Warner.  No reasonable jury would have found Ryan provided Warner with access to this information and blessed his attempts to benefit from it, without also believing that Ryan did so as part of his exchange of benefits with Warner, and the jury's findings that such benefits were not merely incident to friendship supports this finding.

### g. Ryan's Convictions  on the Warner Mail Fraud Counts Survive Harmless Error

For the reasons described above, the court finds that the instructional errors regarding the mail fraud counts related to the relationship between Ryan and Warner were harmless.  The Government demonstrated both circumstantial and direct evidence of a "stream of benefits" flowing between Ryan and Warner.  The jury received instructions that if Ryan received these benefits without the intent to be influenced, there was no criminal act.  Ryan's defense argued forcefully for

this proposition, and the jury rejected it. The jury was also instructed that if Ryan engaged in these activities in good faith, that would defeat the intent necessary for a scheme to defraud. The jury rejected this defense as well.

Even proceeding under a bribery theory, the Government was not required to prove that Ryan and Warner agreed on specific actions to be taken in exchange for specific benefits. The Government only needed to prove what it argued in most instances—that Ryan and Warner were engaged in an exchange of benefits in which Warner provided Ryan with gifts and cash, and Ryan provided Warner with opportunities to profit from the State's business in the form of leases, contracts, or inside information. Had some of the counts of conviction rested solely on the concealment of a conflict of interest, they might fail under the *Skilling* holding; but in this case, the only conflict of interest that Ryan could have concealed was the benefits he was receiving from Warner. On this record, it is not credible that the jury believed Ryan engaged in a pattern of concealment simply because he was doing "favors" for some friends, and, as discussed above, the jury affirmatively rejected this argument.

Further, the jury found Ryan guilty on numerous false statement and tax charges, suggesting it believed that he had accepted financial benefits and lied to the IRS and FBI about them, and lied about his personal financial relationship with Warner. While Ryan could well have had independent reasons for lying, in the context of the evidence presented, no reasonable jury that believed he concealed benefits and believed he played a role in these transactions could have believed one was not in exchange for the other.

### 3. Harry Klein-related Mail Fraud Count

Count Six is the sole count of mail fraud related to Harry Klein. That count charged that the mailing of a check from the State of Illinois to a company controlled by Klein was in furtherance of the mail fraud scheme.

Each year from 1993 to 2002, Ryan vacationed at Klein's home in Jamaica. The government demonstrated that Ryan engaged in sham transactions in which he would write a check to Klein for $1,000—purportedly in return for his accommodations in Jamaica—and then accept that same amount in a cash payment back from Klein. (Pet.'s Br. at 17; Tr. 2838-42; 2844; 9432-44.) In 1997, Ryan proposed that the Secretary of State lease a building owned by Klein for a commercial drivers' license facility. *Warner*, 2006 WL 2583722, at *10. This court found "ample evidence in the record to support the government's position that this lease was foisted on SOS staff because Ryan wanted to do his friend a favor. Ryan's personal intervention on Klein's behalf initiated the transaction, and Ryan remained involved thereafter." *Id.* Ryan now argues that this mailing was not in furtherance of a bribery scheme. He points to a separate count on which he was convicted for concealing this cash-back arrangement, and argues that he might have concealed these benefits solely because receiving gifts for more than $50 violated state law. (Pet.'s Br. at 17.) True enough, but merely concealing the cash-back arrangement would not be sufficient evidence on which the jury would have convicted Ryan for *this* mailing, which involved a payment from the State to Klein for the South Holland lease.

Ryan also argues, as the court noted, and as argued with the Warner counts, that Ryan must simply have been doing his friend a favor. The indictment, however, required the jury to find, if it believed that the receipt of money from Klein was in furtherance of the scheme, that the money must have been received with the intent to influence Ryan in the performance of his official duties—in other words, for the jury to believe that Ryan received the money in furtherance of the scheme, they must have believed he received a bribe.

Further, on this count specifically, the Government and Ryan both argued on the same terms. In its closing argument, the Government explained,

> Those $100 bills, those cash payments were corrupt payments. You see, those cash payments that Ryan received from Klein made that lodging a free gift. And during the period that George Ryan took that gift, he took official action that

40

> benefitted Harry Klein, both in the 1995 currency exchange increase and also in the 1997 South Holland lease. And he was doing this all while he was hiding that gift behind a sham paper trail. And Ryan knew that those payments were corrupt payments, because he never reported them. He never disclosed the free lodging that those payments accomplished. He never disclosed that free lodging on his Statement of Economic Interests. And he lied about them to the FBI, as you have heard. And he also lied about them to the public through his press spokesman.

(Tr. 23085.) Ryan argued, then as he does now, that any favor done for Klein was just that—a favor, nothing more. "It's a crime if George Ryan accepted benefits to perform official acts. But it's not a crime if all George Ryan did is try to do things that sometimes benefitted political supporters." (Tr. 23159-23160.) Ryan pointed the jury to the instruction that explained that good faith is a defense, and argued that Ryan had arranged the lease because it was in the best interests of the State. Further, Ryan reminded the jury that the receipt of personal benefits is a crime only if the benefits were received with the understanding they were given with the intent to influence official action. (Tr. 23148.) In short, the jury was presented with two different versions of these payments, and adopted the Government's view.

No reasonable jury would have believed that Ryan concealed the benefits he received from Klein, steered a lease to Klein, and accepted illegal benefits from Klein, without also believing those benefits were given with the intent to influence his official action, and that he accepted those benefits with the intent to be influenced.

### 4. Count One (RICO)

Ryan argues that "[b]ecause his RICO conviction was predicated on the mail fraud charges, it is invalid as well." (Pet.'s Br. at 21.) Having determined that Ryan's conviction on Counts Two through Eight stand after harmless error review, the court finds that Ryan's conviction on the RICO count also stands.

## II. Pecuniary Fraud

The Government argues that even if Ryan's conviction cannot be sustained based on an honest services bribery theory, it can be sustained on a pecuniary fraud theory. The vast majority

41

of the post-*McNally* cases found support for convictions based on this alternate theory.[14] In

---

[14]     Since *McNally*, in nearly every case where the conviction was arguably based both on a straight fraud theory and on an honest services fraud theory, the Seventh Circuit has upheld the conviction under a theory of pecuniary fraud. *See, e.g.*, *United States v. Ewing*, No. 95-2009, 74 F.3d 1242, at *2 n.4 (7th Cir. 1996) (defendant challenged his conviction of honest services fraud on the ground that his conduct pre-dated the statutory amendment generated by *McNally*; court held guilty plea of bribery and bid-rigging could be sustained as pecuniary fraud because "the loss suffered by [defendant's employer] was not 'incidental.' Instead, the money Ewing received as bribes flowed directly, if somewhat circuitously, from the coffers of [his employer] to Ewing."); *United States v. Catalfo*, 64 F.3d 1070, 1077 (7th Cir. 1995) (upholding conviction of options trader who made unauthorized trades under  pecuniary fraud theory because "he deprived [the firm that sponsored him] of the right to control its risk of loss, which had a real and substantial value"); *United States v. Cherif*, 943 F.2d 692, 697 (7th Cir. 1991) (upholding mail fraud conviction of a bank employee who traded on the basis of confidential information obtained from bank because "it is not idle speculation to conclude that the confidentiality of the information was commercially valuable to the bank because breaches of confidentiality could harm the bank's reputation and result in lost business . . . ."); *Frank v. United States*, 914 F.2d 828, 834 (7th Cir. 1990) (rejecting petition for § 2255 relief; fixing DUI cases could constitute pecuniary fraud where the scheme involved the theft of surrendered licenses and court records, even though only one of numerous paragraphs describing the scheme included language referencing tangible property); *Ginsburg v. United States*, 909 F.2d 982, 987 (7th Cir. 1990) (concluding, in a § 2255 case, that defendant lawyer's payment of cash bribes for fixing tax appeals constitutes pecuniary fraud because it deprived the county of its right to collect taxes from defendant's clients); *Bateman v. United States*, 875 F.2d 1304, 1309 (7th Cir. 1989) (on § 2255 review of an "honest services" conviction, denying relief because defendant's bid-rigging scheme caused his employer "to pay substantially more for equipment than it would have if Bateman had not engaged in this scheme"); *Ranke v. United States,* 873 F.2d 1033, 1040 (7th Cir. 1989) (upholding conviction based on commercial kickback scheme because defendant's employer "was induced to part with its money on the basis of the false premise . . . that [defendant] would not receive a portion of that money"); *Messinger v. United States*, 872 F.2d 217, 220 (7th Cir. 1989) (upholding conviction of defendant lawyer where judge received cash bail bond in exchange for favorable ruling because "Cook County has a property right, albeit an intangible one, in its security interest represented by the cash bail bond"); *United States v. Cosentino*, 869 F.2d 301, 307 (7th Cir. 1989) (affirming conviction of defendants who looted the assets of an insurance company and deceived regulators; the scheme to deprive the insurer of its right to defendants' honest services was the same scheme that bled the insurer of assets and permitted it to write more insurance than authorized); *United States v. Doe*, 867 F.2d 986, 989 (7th Cir. 1989) (upholding conviction for fixing tax cases because the scheme deprived the county of tax revenue); *Moore v. United States*, 865 F.2d 149, 151 (7th Cir. 1989) (rejecting § 2255 petition for bid-rigging honest services conviction because the existence of a lower-cost bid demonstrates that his public employer suffered financial loss); *United States v. Bailey*, 859 F.2d 1265, 1276 (7th Cir. 1988) (bank official who manipulated the bank's net worth to evade regulators was charged with honest services fraud, but the content of each count of conviction "alleged schemes with the potential to expose [bank's] money and property to plunder by artificially keeping [bank] in operation"); *United States v. Bonansinga*, 855 F.2d 476, 479 (7th Cir. 1988) (upholding conviction where city councilman paid for personal supplies with public funds because indictment alleged single scheme which deprived public both of honest services and pecuniary fraud); *United States v. Wellman*, 830

(continued...)

several of these cases, the conduct at issue was similar to the conduct that Ryan was convicted of—the awarding of contracts by public officials because of bribes or kickbacks, often without any proof of a monetary loss.  For example, in *Borre v. United States*, 940 F.2d 215 (7th Cir. 1991), the court upheld the conviction of an individual who helped the mayor of Fox Lake and one of its trustees award a cable franchise in exchange for an ownership stake in that franchise.  The court found that the franchise was property, and that a "victim is defrauded of property when the victim loses control over the disposition of that property."  *Id.* at 222.  In *United States v. Keane*, 852 F.2d 199 (7th Cir. 1988), the defendant, a city councilman, had participated in a partnership that bought property from the city at below-market value using inside information and sold it at higher prices to other municipal bodies.  The fact that the scheme may not have been profitable, or may not have victimized his employer, did not undermine his conviction; "the mail fraud statute proscribes fraudulent *schemes*; it does not confine penalties to those whose schemes succeed in raking off cash."  *Id.* at 205 (emphasis in original).

These holdings are directly relevant in this case because in *McNally*, the Supreme Court struck down entirely the theory of honest services mail fraud, leaving only pecuniary fraud to support a conviction.  Thus, in each case decided in the interim between *McNally* and the date on which Congress reinstated the honest services fraud theory, the court asked whether the honest services fraud conviction required the conclusion that the defendant had committed pecuniary fraud as well.  Asking that same question post-*Skilling*, the Seventh Circuit recently upheld one of the fraud counts against Conrad Black based on a $600,000 payment that the court found had no plausible explanation, and therefore must have constituted pecuniary fraud.  *United States v. Black*, 625 F.3d at 393.  Though the court has concluded that the instructional error was harmless, a

_____

(...continued)
F.2d 1453, 1462 (7th Cir. 1987) (affirming conviction of honest services fraud under a pecuniary fraud theory where "the substance of the charge was that Wellman facilitated the sale of the [chemical] tanks by falsely representing that they were in compliance with the regulations.").

finding that Ryan's mail fraud conviction necessarily constitutes pecuniary fraud would be an alternate basis for upholding the conviction.

Ryan argues that this pecuniary fraud theory was never presented to the jury, and thus may not be a basis for upholding the verdict. (Reply Br. at 27.) The indictment itself, however, did state that the scheme charged was one "to defraud the people of the State of Illinois, and the State of Illinois, of *money*, *property*, and the intangible right to honest services" (emphasis added). The instructions also referred to a pecuniary fraud theory, explaining that the first element of the mail fraud charge was that "the defendant knowingly devised or participated in the scheme to defraud or to obtain money or property. . . ." (Instructions at 75; Tr. 23902.) The instructions, too, explained that "the phrase 'intent to defraud' means that the acts charged were done knowingly with the intent to deceive or cheat the people of the State of Illinois in order to cause a gain of money or property to the defendants or others, or the potential loss of money or property to another." (Instructions at 80; Tr. 23904-05.) Finally, the record defeats Ryan's assertion that the Government failed to present the pecuniary fraud theory to the jury. *See, e.g.* (Tr. 23771 ("So, folks, there is two different types of schemes. There is one that's for money or property. That is when you are given state business for leases and you are lying about it. You are giving away property. When you are given—when you are stealing from the state, people's resources, that's property. That's money. You can't do that and lie about it, and there is a mailing in furtherance of it. That's money or property.")). This theory was indeed presented to the jury.

Ryan points to two post-*Skilling* cases that, he says, bar the Government from arguing that Ryan would have been convicted of pecuniary fraud. The first case cited by Ryan involved an honest services conviction based on a scheme wherein former Newark Mayor Sharpe James assisted Tamika Riley, a woman with whom he had an intimate relationship, in acquiring city-owned properties at prices significantly below their market value. *United States v. Riley*, 621 F.3d 312, 318 (3d Cir. 2010). The court explained that, "*[i]n the context of this case, where the fraudulent act is*

44

*the non-disclosure of a conflict of interest*, it would demean the judicial process to attempt to put the genie back in the bottle by essentially rewriting the charge to the jury on Count 5 and assuming the jury made distinctions the Government did not bring out in its summation." *Id.* at 324 (emphasis added). Ryan omits the emphasized portion in his brief, but it demonstrates why the reasoning of this case is inapplicable.

The other case Ryan emphasizes is also inapposite. The scheme to defraud there involved a state employee who set up a dummy company with another individual to which he arranged payments to be made for work completed by others and sold to the state at an inflated price. Br. in Opp'n to Writ of Cert., *United States v. Hereimi*, No. 09-1035, at *2 (U.S. filed May 17, 2010). The Ninth Circuit found the case was clearly tried only under a conflict-of-interest theory not involving bribery, and a pecuniary fraud theory was never presented. *United States v. Hereimi*, No. 08-30468, 2010 WL 3735898 (9th Cir. Sept. 23, 2010).

## A. Loss Standard

Much of Ryan's argument against a finding of pecuniary fraud is based on the Government's failure to present evidence of a provable loss as a result of the scheme. (Reply Br. at 30-31.) Seventh Circuit precedent, however, does not require that there be a provable loss in such cases.[15]

The wire and mail fraud "statutes do not require the government to prove either contemplated harm to the victim or any loss." In *United States v. Leahy,* 464 F.3d 773 (7th Cir. 2006), the defendants postured as minority businesses in order to obtain city contracts they would otherwise not have won. The court rejected their argument that their scheme could not constitute pecuniary fraud because the city paid no more for the services defendants provided than it would

---

[15]     In an earlier opinion addressing a similar argument from Ryan's co-Defendant, the court explained that in a bid-rigging scheme, loss is often inherent: "A vendor paying bribes to Warner for the privilege of doing business with the State presumably could have reduced the price it charged the State by the same amount it was willing to pay Warner. Thus, to the extent a vendor's price factored in payments made to Warner on the side, the State overpaid for that vendor's services." *United States v. Warner,* 292 F. Supp. 2d 1051, 1064 (N.D. Ill. 2003).

have paid a legitimate contractor. The scheme at issue, the Seventh Circuit observed, "precisely and directly targeted Chicago's coffers and its position as a contracting party. . . . [The] object was money, plain and simple, taken under false pretenses from the city in its role as a purchaser of services."). *See also United States v. Sorich*, 523 F.3d 702, 705 (7th Cir. 2008) (finding a scheme that "doled out thousands of city civil service jobs based on political patronage and nepotism" could constitute pecuniary fraud). Numerous recent cases have upheld this theory, finding that no proof of actual or contemplated loss is necessary. *See, e.g., United States v. Azteca Supply Co.,* No. 10 CR 80, 2010 WL 3940717, at *3-4 (N.D. Ill. Oct. 6, 2010) (finding pecuniary fraud in circumstances similar to *Leahy* despite the fact that the lowest bidder received the contracts, observing that "a jury is entitled to find that by depriving a governmental entity of a 'fundamental basis of [its] bargain,' a defendant can deprive that entity of a property right") (citation omitted); *United States v. Fenzl*, ___F. Supp. 2d ___, 2010 WL 3236774, at *2 (N.D. Ill. Aug. 16, 2010) ("As the law stands, the government does not need to establish pecuniary harm or economic loss as an element of the alleged offenses."); *United States v. Villazan*, No. 05 CR 792, 2007 WL 541950, at *5 (N.D. Ill. Feb. 15, 2007) ("Cook County's right to control its own spending is not a regulatory interest but a property right.").

Ryan cites *United States v. Walters*, 997 F.2d 1219 (7th Cir. 1993), in which the court reversed the conviction of a sports agent for mail fraud based on his signing contracts with college athletes in violation of NCAA rules. The Government there alleged that the mailings of scholarship checks to these athletes were in furtherance of the scheme, but the court found they could not be because the universities "were not out of pocket to Walters." *Id.* at 1224 (emphasis omitted). As the Seventh Circuit explained in *Sorich*, this holding "was not a requirement that the defendant receive the money or property, but rather a way of illustrating a deeper problem with the case. The scholarship money that the university sent the athletes was incidental, rather than the target of the scheme." 523 F.3d at 713. In this case, in contrast, the awarding of contracts and leases was the

subject of the mailings and the object of the scheme. The Supreme Court reversed a mail fraud conviction in *Cleveland v. United States*, 531 U.S. 12 (2000), based on the fraudulent receipt of a video poker license, finding that interest to be regulatory, and holding "that § 1341 does not reach fraud in obtaining a state or municipal license of the kind here involved, for such a license is not 'property' in the government regulator's hands."[16] *Id.* at 20. In the case before this court, in contrast, Ryan and Warner were convicted of a scheme that deprived the state of the power to control how its money was spent—the type of deprivation deemed sufficient to support a pecuniary fraud prosecution by other courts that have distinguished *Cleveland*. *See, e.g., United States v. Sorich*, 427 F. Supp. 2d 820, 828 (N.D. Ill. 2006), *aff'd* 523 F.3d 702, *reh'g en banc denied*, 531 F.3d 501 (7th Cir. 2008), *cert. denied*, 129 S. Ct. 1308 (2009).

Several of the charges against Ryan also involved the misappropriation or disclosure of nonpublic information. In a case decided shortly after *McNally*, the Supreme Court decided that the *Wall Street Journal* had a property interest in the content of one of its columns, which was kept confidential prior to publication. "Confidential business information has long been recognized as property," the Court observed. *Carpenter v. United States*, 484 U.S. 19, 26 (1987). *See also United States v. Cherif*, 943 F.2d 692, 695 (7th Cir. 1991) (holding that a scheme involving receipt

---

[16] The Seventh Circuit did hold in a number of additional instances that convictions did not survive review after *McNally* where the Government had not proved deprivation of a property interest. *Toulabi v. United States*, 875 F.2d 122, 125 (7th Cir. 1989) (holding that city not deprived of property because "[a]ccepting bribes to issue licenses did not deprive Chicago of property; it fattened the City's treasury by $50 (the license fee) for each extra license issued."); *United States v. Gimbel*, 830 F.2d 621, 626 (7th Cir. 1987) (reversing conviction after *McNally* for scheme where attorney caused bank to fail to disclose structured currency transactions because "conceal[ing] information from the Treasury Department which, if disclosed, might have resulted in the Department assessing tax deficiencies" did not result in deprivation of a property right); *United States v. Holzer*, 840 F.2d 1343, 1348 (7th Cir. 1988) (vacating conviction of judge for bribery scheme because "Holzer is not accused of having diverted to his own pocket money intended for his employer; the State of Illinois does not sell justice.").

of confidential business information held by bank, for purpose of trading stocks on such information, resulted in deprivation of a property right).

### B.    Count Two

Count Two involved Ryan's interference with proposed changes to specifications for vehicle registration stickers that might have resulted in Warner's client, ADM, losing its contract to manufacture those stickers for the Secretary of State.  The Government argues that "Ryan caused the state to continue to pay ADM for a contract based on specifications that the relevant state official no longer believed were in the state's best interest."  (Response Br. at 38.)  Ryan argues that the only false representation made by Ryan regarding this contract was that the security mark was necessary for public safety, and that "the Government presented no evidence that Ryan did not believe what he said."  (Reply Br. at 32.)

The jury was instructed that good faith was a defense to every count—that "[g]ood faith on the part of the defendant is inconsistent with intent to defraud."  (Instructions at 81; Tr. 23905.)  Had the jury believed that Ryan made representations about the ADM contract in good faith—in other words, that he genuinely believed the specifications needed to be changed—it would not have convicted him under either a pecuniary fraud or an honest services theory.  The court concludes that the jury must have believed that these statements were made with the intent to defraud, and in that case, no reasonable jury that convicted Ryan on this count of honest services fraud would have failed to convict him of pecuniary fraud.

### C.    Counts Three and Eight

Count Three involves the State's lease of a building in Joliet owned by Warner, and Count Eight involves the State's lease of a building in Bellwood owned by Warner.   At trial, the Government presented ample evidence that Ryan steered the leases to Warner, and, again, the jury necessarily rejected any good faith defense.  Ryan argues that the only misrepresentation or

nondisclosure involved in these leases was Warner's, and that Ryan "bore no responsibility for Warner's nondisclosures."  (Reply Br. at 33.)

The jury, however, convicted Ryan on Count Twelve, which Ryan does not now challenge, of making false statements to the FBI concerning the Joliet lease.  The jury found that Ryan lied when he said he never had any discussions with Warner about the lease and did not know that Warner would have profited from the lease.  This suggests, at least as to the Joliet lease, that at a minimum, Ryan failed to disclose Warner's interest in the property.

Further, the jury could not have convicted Ryan on either of these counts without believing that Ryan and Warner intended to defraud the State of either property or honest services.  To convict Ryan of honest services fraud, the jury must have found that, at the least, that Ryan failed to disclose his conflict of interest—i.e., that Warner stood to profit from the leases and that Ryan had a personal financial relationship with Warner (as the jury also concluded in Count Twelve). This   requires  the  conclusion  that  the  jury  must  have  believed  Ryan  made  material misrepresentations or nondisclosures regarding these leases, and that Ryan was guilty of pecuniary fraud on these counts.

Ryan further argues that he cannot be responsible for Warner's nondisclosures under a theory of conspiracy because "[t]he only conspiracy in which Ryan and Warner allegedly participated . . . was a conspiracy to conduct the affairs of an enterprise through a pattern of pre-*Skilling* honest services fraud." (Reply Br. at 33.)  Ryan's responsibility for his own nondisclosures suffices to satisfy that element of the mail fraud charge here, for reasons explained earlier, the conspiracy conclusion that the jury reached is not undermined by *Skilling.*

### D.     Counts Four and Five

Counts Four and Five grow out of the award of a mainframe computer to contract to IBM, which at the time was a client of Warner's.  The evidence at trial established that Ryan allowed Warner and Udstuen to choose the individual who would serve as director of the SOS department

that bid on the mainframe, essentially allowing them to fix the contract. Again, at a minimum, the jury found that Ryan failed to disclose a conflict of interest concerning this episode when they determined that he had deprived the State of its right to honest services. The only conflict of interest that Ryan could have failed to disclose, based on the evidence at trial, was that he was engaged in an exchange of benefits with Warner.

Ryan argues that the only material nondisclosure related to the IBM contract was the receipt of gifts from Warner that were unrelated to any specific action on this contract. Ryan asks whether "an official [could] be convicted of money/property fraud if he approved a contract without revealing that a beneficiary of this contract once took his aunt to dinner?" (Reply Br. at 34.) The answer, of course, is that if the jury found that the official acted in good faith in awarding the contract, then the incidental receipt of a gift to or from a relative would be immaterial. In this case, however, the jury found Ryan did not act in good faith, and it must have found, at least, that that Ryan concealed a conflict related to this transaction, a finding necessary either for either for honest services fraud or pecuniary fraud. The jury must have found Ryan guilty of pecuniary fraud.

Ryan urges that the contract may well have been awarded to IBM regardless of his or Warner's conduct; as explained earlier, however, the lack of actual or contemplated loss does not defeat a verdict of pecuniary fraud. Ryan and Warner perverted the bidding process by concealing their conflicts of interest and therefore denied the State of its power to control how its money is spent—and that is sufficient for a conviction of pecuniary fraud.

### E.     Count Six

In Count Six, the Government charged Ryan with mail fraud related to the award of a lease in South Holland to Harry Klein. As described earlier, the evidence supported a finding that Ryan steered the lease to Klein in exchange for free stays at Klein's home in Jamaica. These stays involved a sham cash-back transaction wherein Ryan would write a check to Klein, and Klein would pay Ryan back in cash.

Ryan's only argument regarding this transaction is that "the award of a contract or lease to the provider of a gift should not be sufficient in itself to establish a fraudulent deprivation of property." (Reply Br. at 35.) Ryan is correct that if that is all that the evidence shows, it is insufficient. Again, however, the jury found at the least that Ryan concealed a conflict of interest; and the only such conflict of interest that Ryan would have concealed was the stream of benefits that he had received from Klein before the lease was awarded. Such a finding establishes the intent to defraud under either an honest services theory or a pecuniary fraud theory. In addition, the jury found in Count Eleven that Ryan made false statements to the FBI when he said he paid his own expenses in Jamaica, and that he did not take part in, or know the details of, the South Holland lease. Based on these findings, the jury must have convicted Ryan of pecuniary fraud on this count.

### F. Count Seven

Analysis of Ryan's conviction on Count Seven follows much the same pattern. Count Seven related to the awarding of a state contract to Viisage, a company that Warner worked for as an unregistered lobbyist. Ryan's alleged nondisclosure in the awarding of this contract was the stream of benefits Warner had provided him, and Warner's failure to register as a lobbyist for Viisage. At a minimum, the jury found that Ryan failed to disclose a conflict of interest related to that contract, a conflict that must have consisted of the exchange of benefits with Warner. Though this contract also might have been awarded regardless of Warner and Ryan's interference, these nondisclosures and the absence of good faith suffice to establish pecuniary fraud, and because the jurors believed that Ryan concealed his interest in this transaction, they also must have believed that Ryan was guilty of pecuniary fraud. Finally, the State's interest in the confidential information related to this contract could also be considered a property interest.

### III. Sufficiency of the Evidence

Ryan argues that the evidence produced at trial was insufficient to support his convictions under the *Skilling* standard, which requires that the honest services scheme involve bribes or kickbacks. "No rational jury could have found Ryan guilty of mail fraud or racketeering in light of the holding in *Skilling*. . . . None of [the] evidence remotely suggested a scheme to obtain bribes or kickbacks." (Pet.'s Br. at 15-16.)

### A.    Standard of Review

In reviewing a § 2255 petition for sufficiency of the evidence, the court "review[s] evidence and draw[s] all reasonable inferences from it in a light most favorable to the government. . . ." *Carnine v. United States*, 974 F.2d 924, 928 (7th Cir. 1992). To determine whether the evidence is sufficient to support the conviction, "we view the evidence and all reasonable inferences derived therefrom in the light most favorable to the government, defer to the jury's credibility determinations, and overturn a verdict only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." *United States v. Blanchard*, 542 F.3d 1133, 1154 (7th Cir. 2008) (quotation omitted).

Because the court has already engaged in harmless-error analysis, much of Ryan's argument regarding the sufficiency of the evidence has been addressed. "[D]etermining whether an evidentiary error is harmless necessarily requires some weighing of the sufficiency of the evidence." *Fuesting v. Zimmer, Inc.*, 448 F.3d 936, 939 (7th Cir. 2006). The court's brief consideration of the sufficiency argument follows.

### B.    The Evidence Was Sufficient to Establish A Bribery Scheme

Ryan's main argument relating to the sufficiency of the evidence is that his activities, even taken in the light most favorable to the government, fail to establish a bribery scheme of the type required for conviction by *Skilling*. As discussed above, *Skilling* imposed limits on the theory of honest services mail fraud, but it did not impose a requirement that the government prove an explicit *quid pro quo*. A bribery scheme can rest on a "stream of benefits," "course of conduct," or

"retainer" theory of bribery. As the jury was instructed in this case, whether benefits or gifts were given with the intent to influence Ryan's exercise of office can be inferred from the evidence presented. In evaluating Ryan's post-trial sufficiency argument, this court observed that "[t]he government introduced a great deal of evidence of Ryan's acceptance of gifts and benefits." *Warner*, 2006 WL 2583722, at *6. The court need not repeat every charge examined in the harmless-error analysis it has just engaged in, for the evidence that Ryan took official actions favorable to Warner and Warner reciprocated with a stream of benefits is sufficient to establish bribery under *Skilling*. The evidence that Harry Klein paid for Ryan's stays at his home in Jamaica, and that Ryan performed acts favorable to Klein, was also sufficient to establish a bribery scheme that included the award of the South Holland lease charged in Count Six.

Because the standard for harmless-error review is more demanding than the standard in a sufficiency-of-the-evidence inquiry, Ryan's challenge to the sufficiency of the evidence of a bribery scheme necessarily fails. And, as explained earlier, the evidence is sufficient for a finding of pecuniary fraud, as well.

IV.     **Ryan Was Not Prejudiced By Non-Bribery-Related Evidence**

Finally, Ryan argues that he was prejudiced by the admission of evidence that would not have been admissible in a post-*Skilling* honest services fraud prosecution. (Pet.'s Br. at 15; Reply Br. at 36-37.) "The Government charged Ryan with a wide-ranging scheme to defraud that extended over twelve years and with a RICO conspiracy predicated upon the alleged mail fraud scheme. Most of the conduct alleged to be part of the scheme cannot remotely be characterized as bribes or kickbacks. Evidence of this conduct would be inadmissible in a post-*Skilling* mail fraud trial and would be highly prejudicial in a trial of legitimate mail fraud charges." (Pet.'s Br. at 15.)

Ryan does not suggest a standard that should govern the court's review on this issue, although he appears to agree that *United States v. Owens*, 424 F.3d 649 (7th Cir. 2005) applies. *Owens* states that "[t]he test for harmless error is whether, in the mind of the average juror, the

prosecution's case would have been 'significantly less persuasive' had the improper evidence been excluded." *Id.* at 656 (citing *United State v. Eskridge*, 164 F.3d 1042, 1044 (7th Cir. 1988)).

Ryan identifies six specific pieces of evidence that, he claims, are inadmissible post-*Skilling*. The court addresses this evidence in turn.

### A. Gifts in Excess of $50

Ryan contends that evidence he accepted gifts in excess of the $50 limit established by State regulations and Ryan's own personal policy would now be inadmissible. (Pet.'s Br. at 15.) The Government argues this evidence would be admissible to show his intent to defraud, and was therefore relevant to the mail fraud counts as well as to the false statement counts. (Response Br. at 42.)

The state law and personal reporting requirements are clearly relevant to Ryan's intent to defraud, and would therefore be admissible under either a bribery or pecuniary fraud theory. In each case, the evidence that Ryan failed to disclose gifts when required to do so is probative of whether he intended to conceal or misrepresent his relationships with those receiving state business. Whether this evidence would have been admissible solely on the false statement charges is a closer case, but since the evidence would have been admissible regardless, the court declines to reach that question.

### B. Consulting Fee from Phil Gramm

Ryan next argues that evidence he accepted a consulting fee from the presidential campaign of Senator Phil Gramm and did not report that fee should not have been admitted. The Government noted that this conduct was specifically at issue in one of the tax counts: Count Eighteen charged Ryan with concealing payments from the Gramm campaign and failing to report them on his tax returns. Ryan responds that if these payments were admissible only on the tax charge, he could have sought a severance of the trial on those charges or, absent severance, could have asked for a limiting instruction with respect to this evidence. (Reply Br. at 36.) Nothing in

*Skilling* alters the analysis with respect to the evidence of the Gramm campaign payments. Had Ryan believed the Gramm matter supported a severance or a limiting instruction, he could have asked for such rulings at trial. This issue is not appropriate for § 2255 review.

### C. Discharge and Reassignment of SOS Employees

Ryan argues that evidence of the discharge and reassignment of SOS Inspector General employees in order to stifle an investigation into wrongdoing was inadmissible. (Pet.'s Br. at 15.) The Government argues that this evidence was relevant to establishing his intent to use money from the Citizens for Ryan campaign for his personal use, and his failure to pay taxes on that money. (Response Br. at 42.) In fact, Count Eighteen does include a charge that Ryan used Citizens for Ryan money for personal purposes and failed to disclose it. Ryan makes the same severance and instruction arguments here, and for the reasons already stated, those arguments are unavailing.

### D. Low-Number License Plates

Ryan contends that evidence he allowed Warner to assign low-digit license plates to friends should not have been admitted. (Pet.'s Br. at 15.) The Government responds that this evidence was relevant as it was part of the alleged scheme to defraud, and would be part of that scheme under either an honest services bribery theory or a pecuniary fraud theory. (Response Br. at 42.) This evidence, the Government contends, "made it more believable that SOS employees recognized Warner's clout and acceded to his demands about state contracts and leases." (*Id.*) Ryan cites FED. R. EVID. 404(b) in reply, which explains that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Rule 404(b) does, however, permit the introduction of such acts "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." FED. R. EVID. 404(b). Warner's access to and sway within the Secretary of State's office is clearly admissible and relevant to the charged conduct under this standard.

In any event, the court believes the license plate evidence remains relevant to honest services and pecuniary fraud, as well as to the RICO charge. The awarding of low-digit license plates was part of the charged scheme outlined in the summary indictment, and as the court noted earlier, "low-digit license plates appear to have a cachet in Illinois. In the court's view, awarding such items of value to specific campaign contributors is not comparable to generally supporting legislation favored by them." *Warner*, 2005 WL 2367769, at *3. To the extent that low-digit license plates have value, that value belongs to the State, not to Warner and Ryan or their friends. This objection is overruled.

### E.    Revealing Information About Grayville Prison

Ryan argues that in a post-*Skilling* prosecution, evidence that he leaked information to Swanson concerning the location of the Grayville prison would not have been admitted. (Pet.'s Br. at 15.) The Government responds that this information was admissible "to prove the flow of benefits between Ryan and Swanson" and that this conduct was directly charged in Count Ten. (Response Br. at 42-43.) Ryan again replies with a 404(b) objection.

The evidence at issue related directly to a charged count and certainly would have been admitted; *Skilling* does not require the conclusion that this count would have been dismissed pretrial. In any event, the evidence at issue related only to a discrete occurrence, and although it did not portray Ryan in a positive light, the court is confident the Grayville Prison evidence was not unfairly prejudicial. This objection, too, is overruled.

### F.    Use of Government Employees and Supplies for Campaign Purposes

Finally, Ryan argues that evidence he allowed government employees to work on his campaign and allowed property belonging to the Secretary of State's office to be used for his campaign should not have been admitted. (Pet.'s Br. at 15-16.) The Government argues that this evidence was relevant to show how Ryan "used false pretenses, including false time sheets, to obtain state money and property." (Response Br. at 43.)

56

The court agrees with Ryan that this evidence would not be admissible, post-*Skilling*, to prove honest services fraud, as it alleges the very type of self-dealing that *Skilling* found could no longer supports a conviction under this theory. The evidence might have been relevant to a pecuniary fraud theory, but Ryan accurately points out there was no "mailing in furtherance of this alleged misconduct." (Pet.'s Br. at 16 n.11.)

Nonetheless, in a trial involving a complex scheme to defraud, dozens of witnesses, multiple counts, and spanning many months, the court is not persuaded that the prosecution's case would have been "significantly less persuasive" if this evidence were excluded. Nothing in the record of Ryan's petition suggests this evidence constituted a significant or particularly persuasive part of the Government's case. Therefore, the court concludes the admission of this evidence constituted harmless error.

## V.      Motion to Set Bail

Ryan has also moved to set bail pending the resolution of his § 2255 motion. (Mot. to Set Bail [8].) Ryan submits a number of factors for the court's consideration on this motion, including, most recently, the sad news that his wife of more than fifty years is suffering from a terminal illness. The Ryans' advanced years and their obvious devotion to one another were significant to the court at sentencing and remain so, and the court recognizes that Mr. Ryan poses no risk of recidivism nor danger, were he to be released.

In deciding a motion for release of an individual who has been convicted and sentenced, however, the most relevant factor must not be his or her personal circumstances, but instead the likelihood his § 2255 motion will succeed. Although § 2255 itself does not explicitly provide for setting bail pending the resolution of a petition, the Seventh Circuit has explained that "there is abundant authority that federal district judges in habeas corpus and section 2255 proceedings have inherent power to admit applicants to bail pending the decision of their cases, but a power to be exercised very sparingly." *Cherek v. United States*, 767 F.2d 335, 337 (7th Cir. 1985). The

Government and Ryan disagree on the standard for setting bail, and Ryan admits that "[t]he standard for granting bail in this case is unclear." (Mem. in Supp. of Mot. to Set Bail at 2.)

This court takes no pleasure in depriving any defendant of his or her liberty. The court has had the painful duty to take such action in circumstances more compelling than these—where a young defendant with little education or resources is the sole support of small children, or is the only caregiver for a disabled relative, for example. Any sensitive judge realizes that a lengthy prison term effectively robs the convicted person of what we all value most: months and years with loved ones, some of whom will no longer be there when the sentence has been served. Mr. Ryan, like other convicted persons, undoubtedly wishes it were otherwise. His conduct has exacted a stiff penalty not only for himself but also for his family.

The court need not dwell on the appropriate standard for release of a convicted prisoner. In today's ruling, Ryan's § 2255 petition is dismissed on the merits and his conviction is upheld on all counts. Under any legitimate standard, this context is not appropriate for the "very sparing" exercise of the court's power to set bail. Ryan's motion for release is denied.

## CONCLUSION

For the reasons stated herein, Ryan's motion to vacate, set aside, or correct his sentence [1] is denied. Ryan's motion to set bail [8] is also denied.

ENTER:

Dated: December 21, 2010

_____

REBECCA R. PALLMEYER
United States District Judge

58